UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION       :

OF THE UNITED STATES OF AMERICA       :

FOR AN ORDER AUTHORIZING THE          :    AFFIDAVIT IN SUPPORT
                                           OF APPLICATIONS FOR
CONTINUED INTERCEPTION OF ORAL        :    ORDERS AUTHORIZING
                                           THE CONTINUED
COMMUNICATIONS OCCURRING WITHIN AND :      INTERCEPTION OF
                                           ORAL COMMUNICATIONS
WITHIN THE VICINITY OF THE BLACK      :

2006 LINCOLN ZEPHYR, NEW YORK         :

LICENSE PLATE CRU6469, VIN            :

#3LNHM26126R615611 DRIVEN JOEY LEO    :
- - - - - - - - - - - - - - - - - - x
STATE OF NEW YORK          )
NEW YORK COUNTY            :    ss.:
SOUTHERN DISTRICT OF NEW YORK )

      MICHAEL CASTNER, a Special Agent with the United States

Federal Bureau of Investigation ("FBI"), being duly sworn,

states:

## I.    INTRODUCTION

      1.    I am an "investigative or law enforcement officer

of the United States" within the meaning of Section 2510(7) of

Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and

to make arrests for offenses enumerated in Section 2516, Title

18, United States Code.  I have been employed as a Special Agent

of the FBI for approximately two years.  I am currently assigned

to a task force comprised of Special Agents of the FBI and

detectives of the New York City Police Department ("NYPD") who have been sworn as Special Federal Officers. Our principal responsibility is to investigate the illegal activities of La Cosa Nostra ("LCN") in the New York City area and, specifically, criminal activity involving members and associates of the Genovese Organized Crime Family of LCN. During my tenure with the FBI, I have participated in investigations of, among other things, racketeering, gambling, extortion, loansharking, and money laundering, in violation of 18 U.S.C. §§ 1962, 1955, 1951, 1956-1957, and 892-894 respectively. During the course of these investigations, I have conducted or participated in wire and electronic surveillance, physical surveillance, the execution of search warrants, debriefings of informants, and reviews of taped conversations.

2.    I submit this affidavit in support of an application for an order authorizing the interception and recording of oral communications concerning offenses enumerated in Section 2516 of Title 18 of the United States Code -- that is, racketeering, in violation of 18 U.S.C. §§ 1962 and 1963; loansharking, in violation of 18 U.S.C. §§ 892-894; gambling, in violation of 18 U.S.C. §1955 and extortion in violation of 18 U.S.C. §1951; money laundering in violation of 18 U.S.C. §§1956 and 1957; conspiracy to murder and attempted murder as defined in New York State Penal law chapters 125, 105 and 110, and

2

2420

bankruptcy fraud and bank fraud, in violation of 18 U.S.C.
§§ 152, 157, and 1344[1].    I believe that there is probable cause
to believe that these offenses have been committed, are being
committed, and will continue to be committed by DANNY LEO, a/k/a
"Daniel Leonelli," JOSEPH LEO, a/k/a "Joey Leo," CHARLES SALZANO,
a/k/a "Charlie Salzano," ██████████, ARTIE BOLAND, MARIE
DELNODAL, STEVEN SMITH, ██████████, ██████████
██████ PHILIP ENDELLICATE a/k/a "Philly," ██████████
██████ ALBERT ALFONSO, a/k/a "Cooch," ██████████ PAUL
BARONE, JOE LNU, and JOHN LNU██████████
██████████. The requested Order is sought for a period
of time until the interception fully reveals the manner in which
these individuals and their confederates participate in the
above-described offenses, or for an additional period of thirty
(30) days, whichever occurs first, pursuant to 18 U.S.C.
§ 2518(5).

.3.    I have personally participated in the
investigation of the offenses referred to above.  From my
personal participation in this investigation, and from reports
made to me by other FBI agents, NYPD detectives, and other law

---

[1]    In addition, although aiding and abetting is not a
predicate offense under 18 U.S.C. § 2516, there is probable cause
to believe that the TARGET SUBJECTS (as defined and described
more fully below) have aided and abetted and are aiding and
abetting those substantive offenses, in violation of 18 U.S.C.
§ 2.

3

enforcement authorities, and from debriefings of confidential sources and cooperating witnesses, as well as from reports of physical surveillance, reviews of telephone toll records, the results of court-ordered pen registers, and the review of intercepted wire and oral communications, I am familiar with the facts and circumstances of this investigation. Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by FBI agents or other law enforcement agents, or by confidential sources and cooperating witnesses who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer, or a confidential source or cooperating witness (either of whom may have had either direct or hearsay knowledge of that statement), to whom other law enforcement officers or I have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

4

4.    Because this affidavit is being submitted for the limited purpose of securing an order authorizing the continued interception and recording of oral communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that such an order should be issued.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception and recording of oral communications.  Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate that:

### SUBJECTS AND OFFENSES

5.    There is probable cause to believe that the TARGET SUBJECTS have committed, are committing, and will continue to · commit offenses involving:

(a)   racketeer influenced and corrupt organizations, in violation of Section 1962 (c) and (d) each of which are punishable under Section 1963 of Title 18, United States Code, and conspiring to commit said offenses in violation of Section 1962(d) of Title 18, United States Code, in that the SUBJECTS, and others as yet unknown, are employed by and associated with, and conduct the affairs of, an "enterprise" as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact, although not a

legal entity, to wit, the Genovese Organized Crime Family of LCN, the activities of which affect interstate and foreign commerce through a pattern of racketeering activity consisting of the following offenses:

(i)  making, financing, and collecting extortionate extensions of credit, and conspiring to make, finance and collect extortionate extensions of credit, more commonly known as "loansharking[2]," in violation of Title 18, United States Code, Sections 892, 893 and 894;

(ii) conducting, managing, financing, supervising directing or owning an illegal gambling business which involved five or more persons, remained in continuous business or operation for 30 or more days and had gross revenues which exceeded $2000 in one day, in violation of Title 18, United States Code, Sections 1955 and 2;

(iii) obtaining, attempting to obtain and conspiring to obtain money and property from and with the consent of the owners and operators of various commercial businesses, including restaurants and construction companies, that are

---

[2] "Loansharking" is the practice of loaning money at usurious interest rates where the repayment of such loans is enforced by the implied threat or actual use of physical violence or economic harm. Typically, crew members "kick up" money to the leader of the crew (capo or acting capo).  The money, also referred to as "tribute," is generally a portion of the profits that crew members earn while engaged in illegal activity.  This ensures the association with, and protection of, the crew, capo, and LCN family.

6

engaged in interstate commerce, which consent is and would be
induced by the wrongful use of actual and threatened force,
violence and fear, and thereby would and did affect interstate
commerce, in violation of Title 18, United States Code, Sections
1951 and 2; and

(iv) engaging in financial transactions with
intent to promote the carrying on of specified unlawful activity,
and knowing that the transaction is designed to conceal the
nature, location, source, ownership or control of the proceeds of
specified unlawful activity, and engaging in monetary
transactions in property derived from specified unlawful
activity, commonly known as "money laundering," in violation of
Title 18, United States Code, Sections 1956, 1957 and 2

(v)   violent crimes in aid of racketeering
activity as defined in 18 U.S.C. Section 1959 and conspiracy to
murder and attempted murder as defined in New York State Penal
law articles 125, 105 and 110.

(b)   offenses involving bankruptcy fraud and bank
fraud, in violation of 18 U.S.C. §§ 152, 157, and 1344[3].

---

[3]      In addition, as mentioned above, although aiding and
abetting is not a predicate offense under 18 U.S.C. § 2516, there
is probable cause to believe that the TARGET SUBJECTS have aided
and abetted and are aiding and abetting those substantive
offenses, in violation of 18 U.S.C. § 2.

## THE DESIGNATED VEHICLE

6.    There is probable cause to believe that the VEHICLE has been used by, is presently being used by, is commonly used by, and will be used during the period of interception applied for herewith by two of the TARGET SUBJECTS, and others as yet unknown, in order to accomplish, to discuss, and to commit the offenses described in Paragraph 5 above.

7.    As described in the caption above, the VEHICLE is a black 2006 Lincoln Zephyr, with New York license plate CRU6469 and VIN #3LNHM26126R615611.

8.    Physical surveillance conducted by the FBI indicates that two of the TARGET SUBJECTS, DANNY LEO, and JOEY LEO frequently travel together and hold conversations within the VEHICLE.  This meeting pattern of the SUBJECTS within the VEHICLE has been confirmed by at least one confidential source.  Physical surveillance also has revealed that the VEHICLE is infrequently, if ever, used by any other individuals other than DANNY and JOEY LEO.  Based on this confirmed pattern of activity, the Government is seeking authorization to intercept the SUBJECTS' oral communications within and within the vicinity of the VEHICLE. During this period of interception, members of the task force will use all best efforts to discontinue interception of oral communications when none of the SUBJECTS is present within the VEHICLE.

8

## OBJECTIVES

9.    There is probable cause to believe that (i) particular oral communications of the SUBJECTS concerning the above offenses will be obtained through the interception of oral communications occurring within the VEHICLE.  In particular, these oral communications are expected to reveal:

(a)  the nature, scope, extent, and method of operation of the enterprise known as the Genovese Organized Crime Family of LCN, with which the TARGET SUBJECTS, and others as yet unknown, are associated in fact, and the affairs of which they are unlawfully conducting and conspiring to conduct through a pattern of racketeering activity;

(b)  the identities and roles of accomplices, aiders and abettors, co-conspirators, and other participants in, and the victims of the illegal activities of, the enterprise referred to in Paragraph 5 above, specifically, the identities of those persons committing the TARGET OFFENSES;

(c)  the receipt and distribution of contraband, money and other proceeds resulting from those illegal activities;

(d)  the existence and location of items used to further those illegal activities;

(e)  the existence and location of records used to record or receive the proceeds of those illegal activities; and

(f)  the location and source of resources used to

9

2427

finance those illegal activities.

In addition, these oral communications are expected to constitute admissible evidence of the commission of the TARGET OFFENSES.

### PRIOR APPLICATIONS

10. I have been informed that a review has been conducted of the electronic surveillance files of the FBI.[4] Based on this review, I have been informed that there have been no prior applications for Court authorization to intercept communications inside the TARGET VEHICLE or of the TARGET SUBJECTS, except as noted below:

a. On or about August 20, 1991, the Honorable Lawrence M. McKenna, United States District Judge for the Southern District of New York, issued an order authorizing the interception of oral communications of DANNY LEO, and others. On or about September 3, 1991, this order was amended and then on September 30, 1991, October 30, 1991, December 3, 1991, January 6, 1992, the Court issued orders authorizing the continued interception of oral communications of DANNY LEO and others. Interception pursuant to these orders ceased on or about February 6, 1992.

b. On or about November 29, 1991, the Honorable

---

[4]    A check of FBI, DEA and ICE files was completed on or about September 29, 2006.

10

Sterling Johnson Jr., United States District Judge for the Eastern District of New York, issued two orders authorizing the interception of oral communications of DANNY LEO, and others. On or about January 3, 1992, Judge Johnson re-authorized the interception of oral communications involving these individuals. On or about February 12, 1992, Judge Johnson again re-authorized the interception of oral communications involving these individuals. Interception pursuant to these orders ceased on or about March 13, 1992.

      c. On or about February 4, 2000, the Honorable Michael B. Mukasey, United States District Judge for the Southern District of New York, authorized the interception of wire communications of DANNY LEO and others. On or about March 9, 2000, Judge Mukasey issued an order authorizing the continued interception of oral communications of DANNY LEO and others. On or about April 7, 2000, Judge Mukasey issued a second order authorizing the continued interception of oral communications of DANNY LEO and others. Interception pursuant to these orders ceased on or about May 5, 2000.

      d. On or about February 4, 2000, the Honorable Michael B Mukasey, United States District Judge for the Southern District of New York, authorized the interception of wire communications of ROBERT MILANO, DANIEL LEONELLI, (DANNY LEO) and others. On or about March 9, 2000, and April 7, 2000, Judge

11

2429

Mukasey issued orders authorizing the continued interception of wire communications of ROBERT MILANO, DANIEL LEONELLI, and others.  Interception pursuant to these orders ceased on or about May 6, 2000.

       e.   On or about October 25, 2000, the Honorable John W. Bissell, United States District Judge for the District of New Jersey, authorized the interception of oral communications of ████████ and others.  On or about December 4, 2000, Judge Bissell issued an order authorizing the continued interception of oral communications of ████████ and others.  On or about February 5, 2001, Judge Bissell issued a second order authorizing the continued interception of oral communications of ████████ and others.  Interception pursuant to these orders ceased on or about March 6, 2001.

       f.   On or about November 5, 2001, the Honorable John W. Bissell, United States District Judge for the District of New Jersey, authorized the interception of oral communications of ████████, DANNY LEO and others.  On or about December 13, 2001, Judge Bissell issued an order authorizing the continued interception of oral communications of ████████, DANNY LEO and others.  On or about January 11, 2002, Judge Bissell issued a second order authorizing the continued interception of oral communications of ████████, DANNY LEO and others. Interception pursuant to these orders ceased on or about February

2430

10, 2002.

g.   On or about March 28, 2002, the Honorable
John W. Bissell, United States District Judge for the District of
New Jersey, authorized the interception of oral communications of
DANNY LEO, ███████████, and others.   Interception pursuant to
these orders ceased on or about April 26, 2002.



i.   On or about February 22, 2006, the Honorable
Lawrence M. McKenna, United States District Judge for the
Southern District of New York, issued an order authorizing the
interception of wire communications of JOEY LEO, DANNY LEO, and
others over the cellular telephone assigned call number (646)
752-6332, subscribed to by Marie Delnodal, 515 East 78th Street,
Apartment 1B, New York, New York, 10021-1125, bearing
International Mobile Subscriber Identity ("IMSI") Number
310260702657028 ("TARGET CELLPHONE 1").   Interception pursuant to
this order ceased on March 24, 2006 but on March 28, 2006, the
Honorable Lawrence M. McKenna, United States District Judge for
the Southern District of New York, issued an order authorizing

13

2431

the continued interception of wire communications over this cellphone. On April 26, 2006 the Honorable Colleen McMahon, United States District Judge for the Southern District of New York, issued another order authorizing the continued interception of wire communications over this cellphone. Interception to this order ceased on May 26, 2006, but on June 1, 2006, the Honorable Lawrence M. McKenna, United States District Judge for the Southern District of New York, issued an order authorizing the continued interception of wire communications over this cellphone. Interception of this cellphone ceased on June 30, 2006.

j.    On or about April 7, 2006, the Honorable Lawrence M. McKenna, United States District Judge for the Southern District of New York, authorized the interception of oral communications of DANNY LEO, a/k/a "Daniel Leonelli," JOSEPH LEO, a/k/a "Joey Leo," CHARLES SALZANO, a/k/a "Charlie Salzano," ████████ ARTIE BOLAND, MARIE DELNODAL, PHIL LNU, STEVEN SMITH, ████████ ████████ and others, occurring within a black 2006 Lincoln Zephyr, with New York license plate CRU6469 and VIN #3LNHM26126R615611. Interception pursuant to this order began on April 10, 2006, was authorized for additional 30 day periods on May 9, 2006, June 7, 2006, July 6, 2006, August 4, 2006, August 31, 2006, October 3, 2006 and ceased on November 1, 2006. Continued authorization to intercept

14

2432

these communications is the subject of this affidavit.

        k.   On or about May 12, 2006, the Honorable Lawrence M. McKenna, United States District Judge for the Southern District of New York, issued an order authorizing the interception of wire communications of JOEY LEO, DANNY LEO, CHARLIE SALZANO, and others over: (1) a cellular telephone assigned call number (212) 810-0484, a pre-paid cellphone account with no subscriber information listed, bearing International Mobile Subscriber Identity ("IMSI") Number 310260402309292 ("TARGET CELLPHONE 2" or "JOEY LEO CELLPHONE 2"); and (2) the cellular telephone assigned call number (516) 313-0273, subscribed to by Delores Franco, 64 Trenton Avenue, Atlantic Beach, New York, 11561, bearing Electronic Security Number ("ESN") 05106860359 (the "CHARLIE SALZANO CELLPHONE," or "TARGET CELLPHONE 3"). Interception of TARGET CELLPHONE 2 and TARGET CELLPHONE 3 ceased on June 10, 2006. Interception of TARGET CELLPHONE 3 was re-authorized for and additional 30 day period on June 29, 2006 and ceased pursuant to that order on July 28, 2006.

        l.   On or about September 8, 2006, the Honorable Lawrence M. McKenna, United States District Judge for the Southern District of New York, authorized the interception of wire communications of ██████████ DANNY LEO, JOSEPH LEO, CHARLES SALZANO █████████████████████████████████

██████████████████████ ███████████████████████

2433



## I.   PROBABLE CAUSE

### A.   Background of the Investigation

11.   The background of this investigation is set forth in the February 22, 2006 Affidavit of Special Agent Michael Castner, Federal Bureau of Investigation, which was submitted in support of the application to obtain the February 22, 2006 Order, and which is incorporated by reference herein, and available at the Court's request.  As is described in the February 22, 2006 Affidavit of Special Agent Castner, DANNY LEO was a high-ranking member of the Genovese LCN Family who may have been recently elevated to the position of acting boss of the Genovese LCN Family.  Several of the confidential sources described in that affidavit stated that JOEY LEO is DANNY LEO's driver and engages in criminal activity with, and on behalf of, DANNY LEO.  The confidential sources also explained that CHARLIE SALZANO works closely with DANNY LEO and JOEY LEO in their criminal activities.

### B.   Communications Intercepted Within and Within The Vicinity of the Vehicle Pursuant to the October 3, 2006 Order

12.   Oral communications within and within the vicinity of the VEHICLE pursuant to the October 3, 2006 Order reveal a pattern of oral communications relating to the Genovese LCN

2434

Family racketeering, gambling, extortion, loansharking, money laundering, bankruptcy and bank fraud as well as violent activities of the TARGET SUBJECTS. I have reviewed summaries of these conversations and I have listened to the entirety of the recordings of many of these conversations including the ones that are described below. Where these conversations are set forth in this affidavit, they are set forth only in substance and in part, and are subject to change upon further review. Further, many of the conversations are in code, and the summaries set forth below include, where necessary, my interpretation of that code:

13. Oral communications within and within the vicinity of the VEHICLE pursuant to the October 3, 2006 Order include the following:

a. On October 23, 2006, at approximately 12:16 p.m., DANNY and JOEY were intercepted having the following conversation inside the TARGET VEHICLE. DANNY stated, "I just wanted to...end it [collect the outstanding amount of the original principal that was loaned to CS-7[5] on the loansharking

---

[5] CS-7 is a victim who has been discussed by DANNY, JOEY and CHARLIE on numerous occasions during the course of this investigation and these discussions have been intercepted over the cellphones that we have intercepted as well as the device in the TARGET VEHICLE. CS-7 has described for us the loansharking debt that he owes to SALZANO and, although he has not provided the name of DANNY LEO, he is aware that SALZANO is working for someone who originally lent the money to CS-7 [DANNY]. CS-7 has also described the many payments he/she has made to SALZANO and the recent attempts by SALZANO (and Joe Tricarrio) to collect money from him/her. CS-7 also informed us that, on October 2,

debt]. I don't want to be involved with this fucking shit."
DANNY continued, "See how this guy from that place over there
turned around and says to me, the thing you get to do is buy the
fucking ui [referring to an earlier proposed solution in which
DANNY would take over the business that is owned by CS-7]."
Later in that same conversation, JOEY stated, "And you asked me
'Joey, could you give me not an exact amount but a round about
amount?' Gonna give ui to take it. This was the 14th, a month
before. And he told, turned around and told him." DANNY stated,
"He didn't come up with it [CS-7 didn't come up with a large sum
of money to pay to SALZANO and DANNY on his loansharking debt]."
JOEY stated, "Not only didn't he come up with it, he couldn't
come up with the words [CS-7 couldn't even provide a credible
excuse as to why he couldn't pay]. Says I don't know until 10
days ahead of them." DANNY stated, "Gambling [referring to an
amount of money that was paid to CS-7 from a gambler who lost
money to SALZANO and DANNY on a bet but which was never handed
over to SALZANO by CS-7]." JOEY stated, "So instead of calling
him on the 4th, he called him on the 7th or the 8th. And he told
him, I won't know until he get it [JOEY seems to be explaining
how CS-7 didn't call SALZANO when he was supposed to and then,
when CS-7 did call, he said he will not know when he has the

---

2006 he/she received a call from a 'Joe' who told CS-7 that he,
JOEY, would meet with CS-7 at the end of this week regarding this
debt. This meeting and a subsequent meeting are described below.

money until he has it]." DANNY stated, "10% [possibly referring
to a sum of money that CS-7 was to receive (possibly as a 10%
down payment) on the sale of part of his business]." JOEY
stated, "Now, when he delayed it 2 weeks, we already went there.
He should of been able to tell him, ok, on the 28th, I'm gonna
get $150 [possibly referring to an amount of $150,000 that CS-7
expected to receive for the sale of a portion of his business
which would allow him to pay off the principal of his
loansharking debt]." DANNY stated, "Yeah." JOEY stated, "And
out of the 150, I'm gonna give you, 180, I mean 110 or 80 or
whatever he was supposed to tell him [JOEY is apparently
explaining how he would expect CS-7 to pay $110,000 or $80,000
from this money that he was to receive from the potential buyer
of a portion of his business]." DANNY stated, "yeah." JOEY
stated, "That's all I was saying, he never." DANNY stated, "He
[SALZANO, the LCN member of DANNY's crew who was tasked by DANNY
with the collection of this money from CS-7] doesn't know! How's
he gonna tell you?" JOEY stated, "But they had the thing, they
was just gonna ... closed ui [apparently discussing how they were
close to closing on the deal for a portion of the business]."
DANNY stated, "Charlie doesn't know, how's he supposed to know.
408 [SALZANO] doesn't know, how is he supposed to know that he ui
that. And the guy never told him, his gamblers [referring to how
SALZANO didn't know that CS-7 wasn't up front with SALZANO about

19

2437

when he would pay the loansharking debt and about the gambling debt that CS-7 collected for SALZANO but didn't pass on to SALZANO]." JOEY stated, "Correct and that's why I told him. I know you planned on doing him [possibly referring to a plan to inflict harm on CS-7]." DANNY stated, "Why ui the call. Go there the day it is, and that's it. I believe his ui's trouble. I don't know if you keep saying, hearing the same fucking thing, Joe. I keep on seeing the same thing. He can keep on telling me whatever the fuck he wants." Later in that same conversation, DANNY stated, "Joey, he gets caught in a lie, ain't he gonna pay for it [if CS-7 lies regarding the sale of his business, he is going to 'pay' for it]." JOEY stated, "Sure. But I am not talking about them lying, I'm talking about them just...seems like he is sharp as a tack." DANNY asked, "How'd you stop him from cutting ui?" JOEY stated, "I went with...round a bout things, and then all the others things he answers me about. If I tell you I'm gonna sell you this building. I gotta know how much I am selling the building. That's all I'm saying." DANNY stated, "Uh huh." JOEY stated, "That's all I am saying. What's you are gonna give me is a down payment. But I know I am selling that building." DANNY stated, "You wanted them to pay extra on notes you're saying?" JOEY stated, "No. whatever he does with him is ui." pause JOEY stated, "What do you see us forfeit that house [referring to one of the homes that CS-7 owns and is also

trying to sell]."  (Intercept # 3421)

          b.  On October 23, 2006, at approximately 12:30
p.m., DANNY and JOEY were intercepted having the following
conversation inside the TARGET VEHICLE.  DANNY stated, "But,
ahhh, Tony gave him the right answer.  That word."  JOEY asked,
"Tony did it?"  DANNY stated, "Expert...in this."  JOEY stated,
"Good answer for ui."  pause  DANNY stated, "You see the answer
that Charlie gave."  JOEY stated, "Correct answer.  He know that
from me.  Word is..there's word in the street."  DANNY stated,
"Not me if nobody would tell."  JOEY stated, "You know lesson
is."  DANNY stated, "How come Buddy boy's issues?"  JOEY stated,
"ui"  pause  JOEY stated, "The others words that we used, but we
tell her.  I was gonna ask you that."  DANNY stated, "They are
still with Tiny.  all aboard."  JOEY stated, "Anth..I didn't ask
it."  DANNY stated, "Same one, nobody else, Tony make him
different.  Johnnie threw this fucking title at him [possibly
referring to Johnnie LNU telling someone about Danny's title as
'Boss' of the Genovese Crime Family].  I know what you heard,
what you might have heard or whatever the fuck you heard.  They
threw this title at me.  I don't want it.  [Danny seems to be
explaining that he didn't want the leadership position within the
Genovese Crime Family because he knows the title/position will
bring law enforcement scrutiny]."  JOEY stated, "Let's call him
up."  DANNY stated, "We could use it, but I don't want it

[possibly referring to the additional money that comes with being the 'Boss']." Later in that same conversation, JOEY stated, "I know more than 408 [Charlie Salzano]. Things are supposed to worry him, cause I'm sitting up here." DANNY stated, "Joe, fucking common sense, got arrested, it has to be those beepers [referring to JOEY, SALZANO and PALUMBO's use of paging devices to convey messages]." Still later in that conversation, JOEY stated, "You told him [SALZANO] to do something, that's it, that's the way its gotta be done." DANNY stated, "Who's it come back to, Joe [DANNY seems to be explaining to JOEY that the criminal activity that is being committed by SALZANO will also be attributed to DANNY as 'Boss']? (Intercept #3423)

      c.   On October 28, 2006 at approximately 9:52 a.m., JOEY and SALZANO were intercepted having the following conversation inside of the TARGET VEHICLE. SALZANO stated, "I said, 'what you gonna [give] me, 20 [$20,000] on Thursday?' He [CS-7, a loansharking victim with whom SALZANO met with earlier that morning in a meeting that was recorded by CS-7] said, 'please, have patience.' He [CS-7] says, 'you've waited so long.' He said, 'it's not me, the guy leased the building. It's the fucking city, they fucking, fuck ui. Now it's the concrete, now it's the stucko around the building [SALZANO is informing JOEY of the reasons that CS-7 gave to SALZANO as to why he, CS-7, was having trouble selling the building in which is business is

22

located].' He's now looking to move every which way I ask. He's showing I'm gonna get ui." SALZANO continued, "Could I still go? Florida?" JOEY stated, "I'll ask tomorrow [ask DANNY LEO]." SALZANO stated, "I'm asking you, if he [DANNY LEO] don't want me to go. . ." JOEY stated, "Let me go ask Danny [DANNY LEO]." Later in that conversation, SALZANO stated, "I'm sorry Joe, that I took you out with this [SALZANO is apologizing for asking JOEY to leave his mother's house to meet with him, SALZANO]." JOEY stated, "No, you're minutes away [referring to SALZANO and the fact that he drove from Long Island, where he met with CS-7, all the way to the Bronx where JOEY was staying with his mother]." SALZANO stated, "I know, I know..I'm assuming the other day. You know, I'm sorry I am ruining your fucking life too [likely referring to how DANNY will be unhappy with JOEY and SALZANO for failing to collect the money from CS-7 and the possibility that their handling of CS-7 may have brought law enforcement scrutiny on DANNY and his crew]." JOEY stated, "How are [you] ruining..Charlie. This is life. You ain't gotta tell me nothing, how long did you tell him [how long did SALZANO tell CS-7 it would be before they would commit an act of violence against CS-7]?" SALZANO stated, "I know it, but they...direct Petesie (ph) do it. He wants in. So, he's scared...but he came like ui...ahhh is this happen Joe. well that's when you telled I said Paul [CS-7], you ruined my fucking life with this. ahhh, think

23

John ripe for the picking [possibly referring to John T 'JT,' the
owner of a large taxi company on Long Island who has been
negotiating with CS-7 to acquire a portion of CS-7's business-the
recordings that CS-7 made with SALZANO seem to indicate that 'JT'
is also someone with mafia affiliations.  I believe that SALZANO
may be suggesting that DANNY, JOEY and SALZANO can begin to
extort this other business owner, 'JT']."  JOEY stated, "and did
it Thursday."  SALZANO stated, "Yeah...they went, they mic'd.
they started telling me things..that Paul's pinched.  I go out
and beat him.  Joey I'm fucking dead.  I can't even fucking ui
myself [SALZANO seems to be referring to a belief that he will be
arrested and the suspicion that CS-7 recorded the conversations
that he had with SALZANO]."  JOEY stated, "go on and ask yourself
a personal ui how do you do that"?  SALZANO stated, "yeah, my ass
is killing me, deal[ing] with this shit [with the extortion of
CS-7] this morning."  Later in this conversation, SALZANO
continued, "They [law enforcement] don't even want to accept the
martyr [SALZANO appears to be referring to himself as the person
that will get arrested for this but indicating that the FBI will
want more than him, and will also try to prosecute DANNY for this
extortion of CS-7], this development fucking we want somebody
high up on involving someone...and ahhh."  A bit later in the
conversation, SALZANO continued, "And then they [likely referring
to the FBI] mentioned Danny."  JOEY stated, "Danny never

24

2442

mentioned go over there [JOEY seems to be instructing SALZANO that he should never inform anyone that DANNY sent him to extort CS-7]." Still later in that same conversation, SALZANO stated, "I ui Joey, he comes up with 150 [possibly referring to $150,000, the approximate amount that CS-7 had indicated he might receive from the sal of a portion of his business]." JOEY stated, "oh yeah?" SALZANO stated, "and then I'm gonna go tell him I'll squeeze him for it [a large part of that $150,000 that CS-7 owes to DANNY and SALZANO for the loansharking debt." (Intercept #3479)

D.    **Physical Surveillance of the TARGET SUBJECTS**

15. On Saturday, October 7, 2006, at approximately 8:30 a.m., myself and other agents observed SALZANO and JOE TRICARRIO meet with CS-7. This surveillance was audio recorded by CS-7 and videotaped by a Sergeant with whom I work. During this meeting, in which SALZANO stated to CS-7 that he, SALZANO expected CS-7 to produce $50,000 for SALZANO, SALZANO cautioned CS-7, "If I find out Paul, and catch you in a lie, I'm gonna shoot you to Danny." SALZANO also asked CS-7 about the gambling money that CS-7 collected for SALZANO from a gambler but failed to pass on to SALZANO.

16. On Saturday, October 28, 2006, at approximately 8:30 a.m., myself and other agents again observed SALZANO and JOE TRICARRIO meet with CS-7. This surveillance was audio recorded

25

by CS-7 and videotaped by a Sergeant with whom I work. During this meeting, SALZANO continued to pressure CS-7 to pay his loansharking debt. SALZANO then threatened CS-7 stating, "They don't want me to get violent with you, but they'll send someone to get violent with you."

16. In addition to the intercepted calls, and the physical surveillance, I have met with CS-7, the loansharking/extortion victim of DANNY LEO, CHARLIE SALZANO, and JOEY LEO's loansharking operation to which he/she owes a substantial amount of money.

17. Based on physical surveillances, the substance of intercepted conversations that are described above, as well as on my experience in this and other LCN investigations, I believe that the SUBJECTS are continuing to use the VEHICLE to attend meetings with other Genovese LCN Crime Family members and associates, to collect money generated from their loansharking, extortion and gambling operations, and to discuss their LCN activities, including their gambling operations, extortion and loansharking activity, bank and bankruptcy fraud and money laundering.

2444