UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
IN THE MATTER OF THE APPLICATION            :

OF THE UNITED STATES OF AMERICA             :    **AFFIDAVIT IN SUPPORT**
                                                 **OF APPLICATION FOR**
FOR AUTHORIZATION TO CONTINUE TO            :    **AUTHORIZATION TO**
                                                 **CONTINUE TO INTERCEPT**
INTERCEPT WIRE COMMUNICATIONS               :    **WIRE COMMUNICATIONS**

OCCURRING OVER THE CELLULAR TELEPHONE       :

ASSIGNED CALL NUMBER (646) 752-6332         :

AND BEARING IMSI NUMBER 310260702657028 :
-----------------------------------------x

STATE OF NEW YORK                    )
COUNTY OF NEW YORK                   : ss.:
SOUTHERN DISTRICT OF NEW YORK        )

      MICHAEL CASTNER, a Special Agent with the United States

Federal Bureau of Investigation ("FBI"), being duly sworn,

deposes and states:

## I.    INTRODUCTION

      1.    I am an "investigative or law enforcement officer

of the United States" within the meaning of Section 2510(7) of

Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and

to make arrests for offenses enumerated in Section 2516, Title

18, United States Code.  I have been employed as a Special Agent

of the FBI for approximately two years.  I am currently assigned

to a task force comprised of Special Agents of the FBI and

detectives of the New York City Police Department ("NYPD") who

have been sworn as Special Federal Officers.  Our principal

responsibility is to investigate the illegal activities of La
Cosa Nostra ("LCN") in the New York City area and, specifically,
criminal activity involving members and associates of the
Genovese Organized Crime Family of LCN. During my tenure with
the FBI, I have participated in investigations of, among other
things, racketeering, gambling, extortion, loansharking, and
union benefit fraud, in violation of 18 U.S.C. §§ 1962, 1955,
1951, 892-894, and 664, respectively. During the course of these
investigations, I have conducted or participated in wire and
electronic surveillance, physical surveillance, the execution of
search warrants, debriefings of informants, and reviews of taped
conversations.

2.    I submit this affidavit in support of an
application for an order authorizing the continued interception
and recording of wire communications concerning offenses
enumerated in Section 2516 of Title 18 of the United States Code
-- that is, racketeering, in violation of 18 U.S.C. §§ 1962 and
1963; loansharking, in violation of 18 U.S.C. §§ 892-894;
gambling, in violation of 18 U.S.C. §1955;[1]  I believe that there
is probable cause to believe that these offenses have been

---

[1]    In addition, although aiding and abetting is not a
predicate offense under 18 U.S.C. § 2516, there is probable cause
to believe that the TARGET SUBJECTS (as defined and described
more fully below) have aided and abetted and are aiding and
abetting those substantive offenses, in violation of 18 U.S.C.
§ 2.

2

committed, are being committed, and will continue to be committed by DANNY LEO, a/k/a "Daniel Leonelli," JOSEPH LEO, a/k/a "Joey Leo," CHARLES SALZANO, a/k/a "Charlie Salzano," ███████████ ARTIE BOLAND, MARIE DELNODAL, PHIL LNU, STEVEN SMITH, ███████

███████████████████████████████████████████████████████████

(the "TARGET SUBJECTS"). The requested Order is sought for a period of time until the interception fully reveals the manner in which these individuals and their confederates participate in the above-described offenses, or for an additional period of thirty (30) days, whichever occurs first, pursuant to 18 U.S.C. § 2518(5).

        3.    I have personally participated in the investigation of the offenses referred to above. From my personal participation in this investigation, and from reports made to me by other FBI agents, NYPD detectives, and other law enforcement authorities, and from debriefings of confidential sources and cooperating witnesses, as well as from reports of physical surveillance, reviews of telephone toll records, the results of court-ordered pen registers, and the review of intercepted wire and oral communications, I am familiar with the facts and circumstances of this investigation. Except where otherwise noted, the information set forth in this affidavit has

---

2 ███████████████████████████████████████████████████
███████████████████████████████████████████████████████

been provided to me directly or indirectly by FBI agents or other law enforcement agents, or by confidential sources and cooperating witnesses who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer, or a confidential source or cooperating witness (either of whom may have had either direct or hearsay knowledge of that statement), to whom other law enforcement officers or I have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

4.    Because this affidavit is being submitted for the limited purpose of securing an order authorizing the continued interception and recording of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that such an order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception and recording of wire communications. Based upon

4

this knowledge, I allege the facts contained in the paragraphs below to demonstrate that:

## SUBJECTS AND OFFENSES

5.    There is probable cause to believe that the TARGET SUBJECTS have committed, are committing, and will continue to commit offenses involving:

(a)    racketeer influenced and corrupt organizations, in violation of Section 1962(c) and (d) each of which are punishable under Section 1963 of Title 18, United States Code, and conspiring to commit said offenses in violation of Section 1962(d) of Title 18, United States Code, in that the SUBJECTS, and others as yet unknown, are employed by and associated with, and conduct the affairs of, an "enterprise" as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact, although not a legal entity, to wit, the Genovese Organized Crime Family of LCN, the activities of which affect interstate and foreign commerce through a pattern of racketeering activity consisting of the following offenses:

(i)    making, financing, and collecting extortionate extensions of credit, and conspiring to make, finance and collect extortionate extensions of credit, more

5

commonly known as "loansharking[3]," in violation of Title 18, United States Code, Sections 892, 893 and 894;

(ii) conducting, managing, financing, supervising directing or owning an illegal gambling business which involved five or more persons, remained in continuous business or operation for 30 or more days and had gross revenues which exceeded $2000 in one day, in violation of Title 18, United States Code, Sections 1955 and 2; (the "TARGET OFFENSES").[4]

### THE DESIGNATED CELLPHONE

6.   There is probable cause to believe that the TARGET SUBJECTS of this investigation have been using, are using, and will in the future use the cellular telephone assigned call number (646) 752-6332, subscribed to by Marie Delnodal, 515 East 78th Street, Apartment 1B, New York, New York, 10021-1125, bearing International Mobile Subscriber Identity ("IMSI") Number 310260702657028, and with service provided by T-Mobile USA (the

---

[3] "Loansharking" is the practice of loaning money at usurious interest rates where the repayment of such loans is enforced by the implied threat or actual use of physical violence or economic harm. Typically, crew members "kick up" money to the leader of the crew (capo or acting capo). The money, also referred to as "tribute," is generally a portion of the profits that crew members earn while engaged in illegal activity. This ensures the association with, and protection of, the crew, capo, and LCN family.

[4]   In addition, as mentioned above, although aiding and abetting is not a predicate offense under 18 U.S.C. § 2516, there is probable cause to believe that the TARGET SUBJECTS have aided and abetted and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

6

1120

"JOEY LEO CELLPHONE," or the "TARGET CELLPHONE")[5], to make wire
communications in furtherance of, in connection with, to
facilitate, to accomplish, and to commit the above-described
TARGET OFFENSES.

      7.    I have been informed by other law enforcement
personnel who are familiar with the applicable telephone
technology that a "portable cellular telephone" (or a "mobile
telephone") can be used both within a vehicle and outside a
vehicle through the use of a portable battery pack.  The cellular
telephone system divides the New York City and other metropolitan
area into many small coverage areas, which are called "cells."
As a vehicle in which a portable cellular telephone is located,
or the cellular telephone itself, is moved from one cell to
another, transmitters within each cell and a master switching
network permit "wire communications" to be completed.  Each
portable cellular telephone that does not contain party lines
bears a unique ESN or IMSI number and an assigned telephone
number.  It is requested that interception be permitted over the
JOEY LEO CELLPHONE, and any other telephone numbers accessed
through the above-listed IMSI number for the JOEY LEO CELLPHONE,

---

     [5]    The TARGET CELLPHONE utilizes an IMSI number, encoded
into a removable computer chip located inside the instrument.
Accordingly, this application seeks authorization to intercept
communications occurring over any telephones or telephone numbers
accessed by or through the use of the IMSI number identified
above.  The number assigned to the computer chip is unique to the
subscriber, as opposed to the phone.

and any IMSI number accessed through the telephone number
assigned to the JOEY LEO CELLPHONE.

8.    In conjunction with the telecommunication company
which provides service for the JOEY LEO CELLPHONE, all
interceptions will automatically be routed to the Southern
District of New York, regardless of where the telephone calls are
placed to or from.  During the requested wire surveillance, all
monitoring will be performed in the Southern District of New
York, by law enforcement officers authorized under Section
2510(7) of Title 18, United States Code, including Special Agents
of the FBI, deputized NYPD detectives, and other law enforcement
officers who will be acting under the supervision of
investigative or law enforcement officers authorized to conduct
the interception.

9.    Because of the mobility of portable cellular
telephones -- which are mobile interception devices --
authorization is requested pursuant to Title 18, United States
Code, Section 2518(3) for authorization to intercept wire
communications both within the Southern District of New York,
and, in the event that the JOEY LEO CELLPHONE is transferred
outside the jurisdiction of this Court, in any other jurisdiction
within the United States.  In addition, it is requested that
background conversations in the vicinity of the JOEY LEO
CELLPHONE, while it is off the hook or otherwise in use, also be

8

permitted to be intercepted.

## OBJECTIVES

10.    There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will reveal or help to reveal:

(a)    the nature, scope, extent, and method of operation of the enterprise known as the Genovese Organized Crime Family of LCN, with which the TARGET SUBJECTS, and others as yet unknown, are associated in fact, and the affairs of which they are unlawfully conducting and conspiring to conduct through a pattern of racketeering activity;

(b)    the identities and roles of accomplices, aiders and abettors, co-conspirators, and other participants in, and the victims of the illegal activities of, the enterprise referred to in Paragraph 5 above, specifically, the identities of those persons committing loansharking, or illegal gambling offenses;

(c)    the receipt and distribution of contraband, money and other proceeds resulting from those illegal activities;

(d)    the existence and location of items used to further those illegal activities;

(e)    the existence and location of records used to record or receive the proceeds of those illegal activities; and

(f)    the location and source of resources used to

9

finance those illegal activities.

In addition, these wire communications are expected to constitute admissible evidence of the commission of the TARGET OFFENSES.

### PRIOR APPLICATIONS

11.  I have been informed that a review has been conducted of the electronic surveillance files of the FBI.[6] Based on this review, I have been informed that there have been no prior applications for Court authorization to intercept communications over the JOEY LEO CELLPHONE or of the TARGET SUBJECTS, except as noted below:

a.  On or about August 20, 1991, the Honorable Lawrence M. McKenna, United States District Judge for the Southern District of New York, issued an order authorizing the interception of oral communications of DANNY LEO, and others.  On or about September 3, 1991, this order was amended and then on September 30, 1991, October 30, 1991, December 3, 1991, January 6, 1992, the Court issued orders authorizing the continued interception of oral communications of DANNY LEO and others. Interception pursuant to these orders ceased on or about February 6, 1992.

b.  On or about November 29, 1991, the Honorable

_____

[6]    A check of FBI, DEA and ICE files was completed on or about January 17, 2006, February 16 and 17, 2006 and March 23, 24 27, and 28, 2006.

1123A

Sterling Johnson Jr., United States District Judge for the
Eastern District of New York, issued two orders authorizing the
interception of oral communications of DANNY LEO, and others.  On
or about January 3, 1992, Judge Johnson re-authorized the
interception of oral communications involving these individuals.
On or about February 12, 1992, Judge Johnson again re-authorized
the interception of oral communications involving these
individuals.  Interception pursuant to these orders ceased on or
about March 13, 1992.

           c.  On or about February 4, 2000, the Honorable
Michael B. Mukasey, United States District Judge for the Southern
District of New York, authorized the interception of wire
communications of DANNY LEO and others.  On or about March 9,
2000, Judge Mukasey issued an order authorizing the continued
interception of oral communications of DANNY LEO and others.  On
or about April 7, 2000, Judge Mukasey issued a second order
authorizing the continued interception of oral communications of
DANNY LEO and others.  Interception pursuant to these orders
ceased on or about May 5, 2000.

           d.  On or about January 17, 2006, the Honorable
Theodore H. Katz, United States Magistrate Judge for the Southern
District of New York, issued an order authorizing the use of a
pen register with a caller identification device and/or trap and
trace device and cell site location authority for the TARGET

11

CELLPHONE.

       e.   On or about October 25, 2000, the Honorable John W. Bissell, United States District Judge for the District of New Jersey, authorized the interception of oral communications of ▓▓▓▓▓▓▓▓▓▓▓ On or about December 4, 2000, Judge Bissell issued an order authorizing the continued interception of oral communications of ▓▓▓▓▓▓▓▓ others. On or about February 5, 2001, Judge Bissell issued a second order authorizing the continued interception of oral communications of ▓▓▓▓▓▓▓ ▓▓▓▓▓. Interception pursuant to these orders ceased on or about March 6, 2001.

       f.   On or about November 5, 2001, the Honorable John W. Bissell, United States District Judge for the District of New Jersey, authorized the interception of oral communications of ▓▓▓▓▓▓ DANNY LEO ▓▓▓▓▓▓. On or about December 13, 2001, Judge Bissell issued an order authorizing the continued interception of oral communications of ▓▓▓▓▓▓, DANNY LEO ▓▓▓▓▓▓ ▓▓▓▓▓ On or about January 11, 2002, Judge Bissell issued a second order authorizing the continued interception of oral communications of ▓▓▓▓▓▓, DANNY LEO ▓▓▓▓▓▓ Interception pursuant to these orders ceased on or about February 10, 2002.

       g.   On or about March 28, 2002, the Honorable John W. Bissell, United States District Judge for the District of

New Jersey, authorized the interception of oral communications of DANNY LEO, ▮▮▮▮▮▮▮▮▮▮▮▮ Interception pursuant to these orders ceased on or about April 26, 2002.



      i.   On or about February 22, 2006, the Honorable Lawrence M. McKenna, United States District Judge for the Southern District of New York, issued an order authorizing the interception of wire communications of JOEY LEO, DANNY LEO, and others over the cellular telephone assigned call number (646) 752-6332, subscribed to by Marie Delnodal, 515 East 78th Street, Apartment 1B, New York, New York, 10021-1125, bearing International Mobile Subscriber Identity ("IMSI") Number 310260702657028.  Interception pursuant to this order ceased on March 24, 2006 but it is the subject of this affidavit and application for authorization.

## II.   **PROBABLE CAUSE**

### A.   Background of the Investigation

12.   The background of this investigation is set forth
in the February 22, 2006 Affidavit of Special Agent Michael
Castner, Federal Bureau of Investigation, which was submitted in
support of the application to obtain the February 22, 2006 Order,
and which is attached hereto as Exhibit 1.

### B.   Communications Intercepted Over the TARGET CELLPHONE Pursuant to the February 22, 2006 Order

13.   Communications intercepted over the TARGET
CELLPHONE pursuant to the February 22, 2006 Order reveal a
pattern of telephone calls relating to the Genovese LCN Family
gambling activities of the TARGET SUBJECTS.  I have reviewed
summaries of these calls and I have listened to the entirety of
the recordings of many of these calls including the ones that are
described below.  Where these calls are set forth in this
affidavit, they are set forth only in substance and in part, and
are subject to change upon further review.  Further, many of the
calls are in code, and the summaries set forth below include,
where necessary, my interpretation of that code:

14.   Calls intercepted over the TARGET CELLPHONE
include the following:

a.   On February 23, 2006, at approximately 11:03
a.m., JOEY LEO received a call on the TARGET CELLPHONE from PHIL
LNU using a phone with the number 917-650-9451.  During this

14

call, JOEY asked PHIL, "What's up kid?"  PHIL stated, "Yesterday
we lose $6,800. That guy, Ernie's Mat [a gambler who places bets
with the DANNY and JOEY LEO gambling operation], he won $12,000
yesterday again.  He could destroy you in one week."  JOEY
stated, "don't worry we'll get him for the rest of the week [the
gambler will lose the $12,000 on other bets later in the week."
PHIL stated, "He can destroy you in a week.  We got a shot
because he plays [gambles a lot with the DANNY and JOEY LEO
gambling operation] but right now he's hot."  JOEY stated,
"alright, I'll talk to you in a little while."  PHIL stated,
"SI's guy [a gambler who places bets with SI] is down.  They're
about $7000 down. [Another gambler, SI's guy, lost about $7,000
to the DANNY and JOEY LEO gambling operation]."  JOEY stated, "no
problem."  (Call #40)

        b.    On March 2, 2006, at approximately 9:54 a.m.,
JOEY LEO received a call on the TARGET CELLPHONE from PHIL LNU
using a phone with the number 917-650-9451.  During this call,
JOEY asked PHIL, "What's up pal?"  PHIL stated, "Yesterday we win
$2,700." (Call #663)

        c.    On March 2, 2006, at approximately 11:00
a.m., JOEY LEO had a conversation on the TARGET CELLPHONE with
MARIE DELNODAL.  During this call, JOEY stated, "I want Matthew
to have 1700 [$1,700] for him no matter what, when Philly comes."
MARIE asked, "1700, When, today?"  JOEY stated, "today, tomorrow,

15

whenever Philly is going and seeing him." MARIE asked, "he's got
to have 1700?" JOEY stated, "He's got to have it, that's it!"
MARIE asked, "are you on a break right now?" JOEY stated, "no
I'm actually going home. He, he owes 34 [$3,400 in gambling
losses], I only need 17 [$1,700]. But, he's got to give it to
Philip today or tomorrow." MARIE stated, "okay." JOEY stated,
"If he's got to go to Philip, I don't care. But Philly's gotta
give Ernie $8,000 [$8,000 in gambling winnings], he's [PHIL LNU]
got 6300 [$6,300], he's borrowing 1700 [$1,700] from his brother
in law, so I don't have to go there. [PHIL LNU, JOEY's associate
in this gambling operation, will borrow the additional $1,700 to
pay a gambling customer who won, Ernie, so that JOEY doesn't have
to drive to PHIL LNU with the money to pay Ernie.]" MARIE asked,
"What are you gonna do now?" JOEY stated, "I'm going home. My
uncle [DANNY LEO] gave it to me pretty good today [referencing
earlier conversations about a fight that JOEY had with an ex-
girlfriend in which JOEY suffered an injury to his eye.] (Call
#671)

        d.   On March 6, 2006, at approximately 10:46
a.m., JOEY LEO received a call on the TARGET CELLPHONE from PHIL
LNU using a phone with the number 917-650-9451. During this
call, JOEY asked PHIL, "What was yesterday?" PHIL stated,
"Yesterday, we won 10,000." JOEY stated, "Ok, maybe we will win
a few dollars for the week." PHIL stated, "Oh, its gonna come

16

2840 [$2,840 that] we won for the week." JOEY asked, "Yeah, what do we win?" PHIL stated, "That's (unintelligible), 2 thousand 840." JOEY asked, "That's it?" PHIL stated, "yeah, we won for the week 28,000 [$28,000], the commission is 15,9 [the commission that is paid to the bookmaker who takes bets on behalf of this gambling operation run by DANNY and JOEY LEO] is almost 16 and [after taking out] what he [the bookmaker] gets, we win 2840 [$2,840]. That's why I said you gotta talk to all these people, we are getting killed with commission [PHIL and JOEY have to tell the bookmakers that work for DANNY and JOEY LEO that they will have to accept a lower commission]." JOEY asked, "Who's gotta get a little commission, SI [a bookmaker]?" PHIL stated, "SI, 18 thousand 370, that kid [a gambler who places bets with SI] won 18,000 dollars." JOEY stated, "Ok." PHIL stated, "The new guy, that's who gets all the money." JOEY stated, "Alright, I'll do it all with you later on, I can't do it now where I am." (Call #1117). Based on my training, experience and familiarity with this investigation, I believe that in this call JOEY and PHIL are discussing the amount of money that this gambling operation is netting after paying the gamblers who won and the bookmakers who take the bets on behalf of the operation run by DANNY and JOEY LEO.

e. 

17

1129



      f.   On March 12, 2006, at approximately 10:27 a.m., JOEY LEO used the TARGET CELLPHONE to place a call to PHIL

18

LNU who was using a phone with the number 917-650-9451. During
this call, JOEY stated PHIL, "I got a question for you." PHIL
asked, "what's that?" JOEY stated, "You know I value your
opinion." PHIL stated, "That doesn't show too much smarts on
your part." JOEY asked, "What you just told me about Matthew [a
gambler who places bets with DANNY and JOEY LEO's gambling
operation], alright-let's say they win 13 [$13,000], should I do
what they do to me and send them 7 [$7,000]?" PHIL stated,
"That's up to you." JOEY stated, "No. I'm asking the question, I
mean, that makes us look bad though." PHIL stated, "Yeah. So, I
don't think you could do that." JOEY stated, "When then, the
next time that they owe us money I'm going to tell him if he's
got to borrow it, borrow it because that's what I have to do."
PHIL stated, "Yeah. (unintelligible)..to play, you got to be able
to pay or you don't want to hear it. You need the money every
week." JOEY stated, "Yeah, because when I borrow these tens and
twenties I pay juice [interest to other Genovese Crime Family
members] on them." PHIL stated, "Yeah, I tried to explain that,
I mean that's ridiculous. Everyone is looking out for themselves
and no one is looking out for you. " JOEY asked, "How much is
Cucho [a bookmaker who works for the DANNY and JOEY LEO gambling
operation] stuck [how much is he owed by the gamblers who placed
bets with DANNY and JOEY LEO's operation through him, Cucho]?"
PHIL stated, "12 [$12,000 or $1,200]." JOEY stated, "Ok, that

19

1131

makes us even," PHIL stated, "We're stuck right now." JOEY
stated, "Oh yeah. We're stuck because what's his name is stuck
85 [$8,500]- what's his name? Arnie. Because the other guy won
2000 but that's the other guy. You know. He's in the red [owes
money for bets that he lost], yet you won't get nothing from
that." PHIL stated, "I hear you." JOEY stated, "That's another
4 [$4,000] and then what's his name got a couple of guys stuck,
Jock, that's more and ML [another gambler who places bets with
the DANNY and JOEY LEO gambling operation] is stuck, that's
another 1000 there and what's his name is winning, Dennis. You
can't get the right people to (unintelligible). That's they're
problem." JOEY stated, "We need a big day [a day in which the
gamblers bet a lot of money with DANNY and JOEY LEO's gambling
operation and lose]." PHIL stated, "Like I said it's going to be
a tough day today because there's only four games in college.
That's all." JOEY stated, "Yeah but they'll pile up on them [the
gamblers will bet a lot of money on those games]." PHIL stated,
"Yeah, but I'm saying there's only four games there ain't like a
big thing. There's a bunch of pros if they play that, that's a
different thing." JOEY stated, "Nothing we can do about it right
now, Philie." PHIL stated, "No." JOEY stated, "But I was
thinking about what you told me..and you're right." PHIL stated,
"These people are thinking about themselves. you know and he
knows, this guy [a bookmaker who works for the DANNY and JOEY LEO

20

1132

gambling operation], even before he made him [a gambler] bet,
that he ain't going to get it all because last time it was small
it was a couple of thousand. It took him 2 weeks [even when that
particular gambler only owed $2,000, it took the gambler two
weeks to pay that gambling debt] [re]member? He gave us-- I
think they owed-- I think they owed, they only gave us 17 and he
kept the other 17 for next week.  No, excuse me, he owed..."
JOEY stated, "34 that's the right figure." PHIL stated, "yeah
something like that and the guy won 1500 and he didn't play the
rest of the week 'cause he probably didn't have the money to pay
you." JOEY stated, "I'm starting to worry that the guy [the
bookmaker who is causing a problem to the DANNY and JOEY LEO
gambling operation] is him.." PHIL stated, "It could be. I'm
not saying he is or isn't. I don't think so, but who knows, you
know? But I'm saying, why would you take three people[s] bets if
they're having a hard time [paying the money they owed on their
lost bets]? And letting them bet the way they are, you know if
you want to take their bet to keep their thing, knock them down
to 1000 a week so if he does lose the 1000 you don't get hurt."
JOEY stated, "Alright, I'll call you back." PHIL stated,
"Alright." (Call #1742)

        g.   On March 18, 2006, at approximately 11:41
a.m., JOEY LEO used the TARGET CELLPHONE to place a call to DANNY
LEO who was using a phone with the number 917-216-8819. During

this call, DANNY asked, "Where was he [CHARLIE] when you called?"
JOEY stated, "In the store.  I wanted to tell you what I called
for.  I was supposed to buy some firewood today and it's been
called off. [I was supposed to collect a loansharking
debt/extortion money today but I was not able to collect it.]"
DANNY asked, "For what reason?"  JOEY stated, "The place is
closed, he [the victim is] working out of his house.  Wherever
the stand [the location of the victim's business] is, it is
closed."  DANNY asked, "What happened?"  JOEY stated, "Wherever
the stand was, [it] is sealed."  He [the victim] is working out
of his house."  (Call #2556)  Based on my training, experience
and familiarity with this investigation, as well as the substance
of the call that is described in the paragraph immediately
following, I believe that in this call DANNY and JOEY are
discussing the collection of either a loansharking debt or
extortion payment from a victim who has not paid the money to
SALZANO or JOEY and has closed the business location that he had
previously occupied.

        h.   On March 19, 2006, at approximately 11:43
a.m., JOEY LEO used the TARGET CELLPHONE to place a call to DANNY
LEO who was using a phone with the number 917-216-8819.  During
this call, JOEY stated, "He has asked for a couple of weeks, that
he is selling the property and everything."  DANNY asked, "What
backfired over there?"  JOEY stated, "In other words, the whole

22

1134

place is closed.  This is what he [SALZANO] told me now over the
phone."  DANNY asked, "What happened with the promise [the
victim's promise that he would pay] that it was today, tomorrow,
the day after?"  JOEY stated, "He [SALZANO] told me [that] he
doesn't want to go near him [the victim] and whoever brought him
[SALZANO] the message, asked for two more weeks [SALZANO told
JOEY LEO that he SALZANO doesn't want to go near the victim as
SALZANO is concerned about law enforcement surveillance]."  The
cars are running there, working out of a house [the cars that are
part of the victim's business are operating out of the victim's
house].  The stand is closed.  He said something about squatters,
I don't know what he meant."  DANNY stated, "It's all bullshit,
Joe.  The story.  I want to know what's going on.  If he ·
[SALZANO] is gonna see me Tuesday, he's gonna see me Tuesday."
JOEY stated, "He [SALZANO] told me he's got no kids [FBI agents
conducting surveillance] at his house."  DANNY stated, "It's all
bullshit, the story."  JOEY stated, "He [SALZANO] says he's
alright.  Four days he's a blank. [for four days Salzano says he
has not seen any surveillance outside his house.]"  DANNY asked,
"Where did he call you from?"  JOEY stated, "I don't know whose
number [it is.] It is a 516 number."  DANNY stated, "This guy
[SALZANO] doesn't give a fuck who he gets in trouble.  Is that
his mother's number?  He [SALZANO] has got to come and talk to
me.  He cannot bullshit me like that.  What is he telling me?

23

[That] He's the problem now [that he, SALZANO is the one who is being monitered/wiretapped by the FBI and causing the surveillance activity that he, SALZANO, and DANNY and JOEY LEO have witnessed]?" JOEY stated, "He [SALZANO] told me the place is closed and he is gonna sell the property [the victim is going to sell the property that once housed his business]. He [the victim] asked for a couple of more weeks [before making the debt payment on the loansharking loan], no more loans, no more nothing, just sell." DANNY asked, "Who is he going to sell it to, Joe? That is why I have to see him [SALZANO]. I want to know who he is going to sell it to, and how long it is going to take to sell. That's fuckin bullshit." A bit later in the conversation, DANNY stated, "Make that appointment for Tuesday. What does he [SALZANO] think, [that] he is going to make these guys rob my fuckin money? What's the matter with this fuckin asshole [SALZANO]? " (Call #2557)

## G. SURVEILLANCE OF JOEY LEO

15. During the period that we have been intercepting the JOEY LEO CELLPHONE, I and other agents have observed JOEY LEO on the following occasions as he met with various other Genovese LCN Family members and associates:

a. On March 7, 2006, at approximately 11:30 a.m., JOEY LEO and DANNY LEO were observed as they met with CHARLIE SALZANO at 86th Street between 1st and 2nd Avenues. This

24

meeting lasted approximately 45 minutes and it was video recorded.

b.


## G. ADDITIONAL INFORMATION FROM A CONFIDENTIAL SOURCE



25

### III.    ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A  NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS OVER THE JOEY LEO CELLPHONE

17.    For the following reasons, normal investigative techniques have been tried without success, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to employ:

a.    CS-1, who is discussed in the original Affidavit, does not know all of the details of the TARGET SUBJECTS' criminal conduct believed by your affiant to be necessary to ensure a successful prosecution of the TARGET SUBJECTS.  Nor is CS-1 privy to the full scope of the illegal activities being discussed by the TARGET SUBJECTS.  For example, while CS-1 is familiar with the organized crime ties of TARGET SUBJECTS JOEY LEO and CHARLIE SALZANO, his interaction with them has been mostly historical.  In addition, CS-1 does not know, or have access to, all of the TARGET SUBJECTS or their associates, such as DANNY LEO, whom he has not met.

b.    CS-2, who is discussed in the original Affidavit, has not agreed to record conversations during this investigation and CS-2 has not yet entered into a cooperation agreement with the Government that would require him to testify.  Moreover, CS-2 does not have the kind of access to JOEY LEO that would enable him to fully learn all of the criminal activity of

JOEY LEO or that of many of the people with whom JOEY LEO commits this criminal activity.



      d.   CS-4, who is discussed in the original Affidavit, has agreed to record conversations of the TARGET SUBJECTS to whom he has access and is also expected to testify. However, CS-4 has not been able to meet personally with DANNY LEO, JOEY LEO or CHARLIE SALZANO.  CS-4 attempted to meet with DANNY LEO, the TARGET SUBJECT whom he would be most likely to meet with, and those efforts were unsuccessful.  CS-4 does not know all of the details of the TARGET SUBJECTS' criminal conduct believed by your affiant to be necessary to ensure a successful prosecution of the TARGET SUBJECTS.  Nor is CS-4 privy to the full scope of the illegal activities being discussed by the TARGET SUBJECTS.  For example, while CS-4 is familiar with

1139

payments that the Pisacanos were required to make to DANNY LEO,
he is only familiar with this through discussions with the
Pisacanos and other members of the Genovese LCN Family.  He has
not been informed by any of the TARGET SUBJECTS about their
criminal activity.  In addition, CS-4 does not know, or have
access to, all of the TARGET SUBJECTS or their associates and has
been unsuccessful in attempts to meet with any of them.  The
court authorized interceptions of CS-4's conversations did not
yield any recordings of any of the TARGET SUBJECTS.  In addition,
due to impending arrests in an indicted case on which CS-4 has
worked, CS-4 has been moved to a secure location and, as a
result, will have no further interaction with any of the TARGET
SUBJECTS or with any other LCN leaders or associates.



28



    f. While the information provided by CS-1, CS-2, CS-3, CS-4, and CS-5 has furthered the investigation, none of them are in a position to learn about the full scope of the TARGET SUBJECTS' criminal activities without arousing significant suspicion.

    g. While several of the above confidential sources are associates of the Genovese Family, they are not made members of that organization.  Therefore, it is unlikely that DANNY LEO, JOEY LEO or CHARLIE SALZANO will include them in conversations about the membership, structure, and operations of the Genovese LCN Family.

    h. Physical surveillance of the TARGET SUBJECTS provides only limited evidence as to their illegal activities. Physical surveillance, in and of itself, is useful mainly in placing individuals together, but provides little information regarding the purpose of their meetings or the content of their conversations.  Moreover, physical surveillance has met with only limited success because some of the TARGET SUBJECTS have acted in a manner suggesting that they are surveillance-conscious.  For example, SALZANO has discussed over this TARGET CELLPHONE that he has observed law enforcement surveillance.  The information that will be gained from continued wire surveillance on the JOEY LEO

29

CELLPHONE will assist in further establishing the roles of individuals associated together, the nature of their activities, the location of physical evidence and the like.  Indeed, monitoring of this CELLPHONE has shown that JOE LEO discusses over the TARGET CELLPHONE the details of upcoming meetings, such as the location of meetings and the time they will start.  In addition, the interception of wire communications over the JOE LEO CELLPHONE may provide direct evidence of the substance of conversations and activities in which the TARGET SUBJECTS engage. Further, given the nature of the crimes in which the TARGET SUBJECTS are involved, oftentimes their activities are conducted behind closed doors and therefore not subject to surveillance. As is discussed above, these meetings do not always occur behind closed doors but monitoring of the TARGET CELLPHONE by wire surveillance provides details about when and where meetings will take place making it possible to establish physical surveillance at that location in advance, thereby minimizing the risk of discovery inherent in following the TARGET SUBJECTS or remaining in the vicinity of target locations for long periods of time.

        i.   Telephone toll records and pen registers have provided only limited information.  In fact, although some information has been learned from a pen register during this investigation, it simply cannot reveal the content of wire communications occurring over the JOE LEO CELLPHONE, merely the

fact that calls have been placed to and from the JOE LEO
CELLPHONE. This information alone will not enable law
enforcement officers to identify with certainty the persons
involved in the TARGET SUBJECTS' enterprise, or the contents of
their telephone conversations. The interception of wire
communications, however, will enable law enforcement officers to
identify TARGET SUBJECTS and the content of the communications
related to their criminal activities.

        j.    Use of a federal Grand Jury, as discussed
with the Assistant United States Attorney submitting the
application herewith, does not, at this time, appear to be a
promising method of investigation. All of the TARGET SUBJECTS
are believed to be participants in the criminal activities under
investigation. Such individuals face prosecution themselves; it
is unlikely therefore that any of them would testify voluntarily.
Nor would it be desirable at this time to seek immunity for such
individuals and to compel their testimony. Immunizing them could
thwart the public policy that they be held accountable for their
crimes. The issuance of grand jury subpoenas likely would not
lead to the discovery of critical information and undoubtedly
would alert the TARGET SUBJECTS to the pendency of this
investigation. For many of the same reasons, the use of witness
interviews does not appear to be a promising method of
investigation. Again, witnesses who could provide additional

relevant evidence have not been identified or would themselves be
participants in the illegal activities under investigation.

k.    Applications for search warrants would appear
to be premature at this stage of the investigation because, even
though we have been able to identify, through CS-1 and CS-5, at
least one location where JOEY LEO runs an illegal bookmaking
[gambling] business -- 432 East 116th Street, Harlem, New York --
a search of that location at this time would be premature in
that: (1) the FBI does not know what evidence, if any, would
actually be present in that location; (2) any search of such a
location at this point would not likely reveal the full extent of
the TARGET SUBJECTS' criminal activity, (3) a search at this
point would not likely enable law enforcement officers to
identify with certainty all of the persons involved in the TARGET
SUBJECTS' criminal enterprise; and (4) a search at this time
would alert the TARGET SUBJECTS to the existence of the otherwise
covert criminal investigation.  As to a search of other
locations, it is not known with certainty where the TARGET
SUBJECTS conduct other meetings and direct their other
racketeering, gambling, and loansharking activities.

l.  Arresting any of the TARGET SUBJECTS and
attempting to obtain their cooperation in investigating the
criminal activities of the TARGET SUBJECTS is an investigative
route that, in the judgment of the law enforcement agencies

32

1144

involved, would be too risky at the present time.  This belief is
supported by the fact that since we have begun monitoring this
phone on February 23, 2006, approximately 32 defendants who are
connected to the Genovese LCN Crime Family, including numerous
made members and associates, were arrested and to date none have
cooperated in any way that would allow us to meet the goals of
this investigation.  Were an attempt made to arrest certain
TARGET SUBJECTS and obtain their cooperation in the current
investigation not meet with success, other TARGET SUBJECTS almost
certainly would be alerted to the existence of the investigation
and would take defensive measures that would seriously jeopardize
the investigation.  For example, it is likely that the TARGET
SUBJECTS would take steps to hide or destroy any gambling or
loansharking records in their possession.  In addition, in the
judgment of the law enforcement agencies conducting this
investigation, it is far from certain that any of the
participants in these criminal activities, if identified and
arrested, would cooperate with the Government.  Accordingly, the
risks of failure in attempting to obtain these targets'
cooperation at this stage of the investigation greatly outweigh
any likely benefits, and make that investigative technique
unavailable.

   m. Based on my experience, an undercover
operation is not feasible due, in part, to the unwillingness of

33

the TARGET SUBJECTS to deal extensively with outsiders who are
not members or associates of LCN and are neither friends nor
acquaintances of Genovese LCN Family members or associates.
Moreover, it also would cast suspicion upon -- and consequently
endanger -- any informant who might attempt to introduce into the
organization an outsider, whom the TARGET SUBJECTS might suspect
is an undercover Special Agent.  As a result, it would be
extremely difficult, and dangerous, to attempt to penetrate the
organization with an undercover Special Agent and the likelihood
of successfully doing so is remote at best.

n.    Interviews of the TARGET SUBJECTS do not
appear to be a promising avenue of investigation.  Based on my
experience and the experience of other Special Agents of the FBI,
I believe that any interviews of the TARGET SUBJECTS or the LCN
members they have met with would not be successful.  It is
unlikely that any of the TARGET SUBJECTS would be truthful with
or cooperate in an interview.  Moreover, interviews of any the
TARGET SUBJECTS or of the LCN members described above would
likely be counterproductive as the interviews might alert them to
the covert investigation.  In addition, because of their
culpability, there is no reason for the TARGET SUBJECTS to
provide information unless confronted with facts that would
encourage them to provide truthful information.  Failing that,
they are likely to invoke their privilege against self-incrimina-

34

1146

tion. Interviews would also place the TARGET SUBJECTS on notice of the scope of the investigation. Interviews of victims of the loansharking would not likely be fruitful because many of them have not yet been identified and may be too scared to cooperate with law enforcement at this time.

18. Furthermore, although we have been intercepting communications over TARGET CELLPHONE 1 for almost thirty days, those communications have revealed only part of the SUBJECTS' criminal activities. Accordingly, the authorization to continue to intercept wire communications over TARGET CELLPHONE 1 will enable the FBI to get a more complete understanding of the SUBJECTS' criminal activities and their involvement in the Genovese LCN Family, and to defeat their constant attempts to evade law enforcement scrutiny.

19. For the foregoing reasons, it is believed that the only means by which the full scope of the TARGET SUBJECTS' ongoing criminal activities can be ascertained is by the interception of the TARGET SUBJECTS' wire communications as applied for herewith.

### IV.    CONCLUSION

#### A.    Personnel

20. As noted above, this case is being investigated by a Task Force of the NYPD and FBI. It is anticipated that, during the requested electronic surveillance, all monitoring will be

performed and supervised in the Southern District of New York by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the FBI, deputized NYPD Detectives, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

**B.    Minimization**

21.    All monitoring of wire communications over the JOEY LEO CELLPHONE will be minimized in accordance with Chapter 119 of Title 18, United States Code.  The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges.  In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code.  All monitoring will cease when it is determined that the monitored conversation is not criminal in nature.  Interception will be suspended immediately when it is determined through voice identification, physical surveillance,

36

or otherwise, that TARGET SUBJECTS or any of their confederates,
when identified, are not participants in the conversation, unless
it is determined during the portion of the conversation already
overheard that the conversation is criminal in nature.  If an
interception is minimized, monitoring agents shall spot check to
insure that the conversation has not turned to criminal matters.
It is further requested, pursuant to Title 18, United States
Code, Section 2518(5), that, in the event the intercepted
communications are in a code or foreign language, and an expert
in that code or foreign language is not reasonably available
during the interception period, minimization may be accomplished
as soon as practicable after such interception.

**C.    Authorization Request**

        22.   The information set forth in this affidavit
establishes, among other things, probable cause to believe that:
DANNY LEO, a/k/a "Daniel Leonelli," JOSEPH LEO, a/k/a "Joey Leo,"
CHARLES SALZANO, a/k/a "Charlie Salzano," ███████████ ARTIE
BOLAND, MARIE DELNODAL, PHIL LNU, STEVEN SMITH ████████████
████████████████████████████████████████████████ are
utilizing the JOEY LEO CELLPHONE to discuss and engage in
criminal activity.  Based on the foregoing, it is my opinion that
the interception of wire communications occurring over the JOEY
LEO CELLPHONE, as specified above, is essential to uncover the
full scope of the illegal activity described herein.

37

1149

23.   IT IS HEREBY REQUESTED that orders be issued authorizing law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the FBI, deputized NYPD Detectives, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, to intercept wire communications occurring over the JOEY LEO CELLPHONE concerning the affairs of the enterprise described herein and the TARGET SUBJECTS' commission of the above-described offenses.  Because the offenses described herein are continuing in nature and are likely to continue after the initial interception of the particular communications that are the objects of this request, it is requested that the Court's orders authorizing interception of wire communications not be required to terminate automatically when the communications described above have first been obtained, but be permitted to continue until all wire communications are intercepted that reveal fully the manner in which the TARGET SUBJECTS, and others as yet unknown, participate in the above-described offenses, or until the accomplishment of the objectives set forth in paragraph 12, supra, or for an additional period of thirty (30) days, whichever is earlier.  It is requested that this additional 30-day period be measured from the date of the Court's Order.

24.   IT IS HEREBY REQUESTED, pursuant to the provisions

38

of Title 18, United States Code, Section 2518(4), that it be ordered that the ultimate service provider for the JOEY LEO CELLPHONE furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all incoming and outgoing calls), pen register information (including all dial digits), trap and trace information, and cell site information and audio interception capability (whether the cellular telephone is in roaming mode or otherwise). The assistance of these providers is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the FBI.

25. Because the need for contemporaneous information concerning the intercepted communications is especially important in the present investigation, it is further requested that the service provider be ordered to provide originating and terminating cell site information for the intercepted wire communications, by permitting the FBI to use any system to access such information.

26. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the

investigation, guard against fugitives, and better ensure the safety of agents and others.

MICHAEL CASTNER
Special Agent
Federal Bureau of Investigation

Sworn to before me this
28 day of MARCH 2006

UNITED STATES DISTRICT JUDGE

40

1152