UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x
                                 :

UNITED STATES OF AMERICA      :

                                 :

        -v-                 :            S31 06 Cr. 008 (LAK)

                                 :

                                 :

JOSEPH A. TRICARIO,        :

                                 :

           Defendant.      :

                                 :

-------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRE-TRIAL MOTIONS

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

ERIC SNYDER
BENJAMIN GRUENSTEIN
Assistant United States Attorneys
    - Of Counsel –

# TABLE OF CONTENTS

PAGE

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Indictment and Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT I — THE DEFENDANT'S REQUEST FOR A BILL OF PARTICULARS
SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.    The Defendant Requests a List of Overt Acts . . . . . . . . . . . . . . . . . . . 13

        2.    Request for Identity of Victim and Coconspirators . . . . . . . . . . . . . . . 13

        3.    Other Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

POINT II — THE DEFENDANT'S MOTION TO DISMISS FOR LACK OF VENUE
SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

POINT III — THE DEFENDANTS' REQUESTS FOR AN AUDIBILITY HEARING
SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT IV — CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                        :
UNITED STATES OF AMERICA                :
                                        :
          -v-                           :          S31 06 Cr. 008 (LAK)
                                        :
JOSEPH A. TRICARIO,                     :
                                        :
                    Defendant.          :
                                        :
-----------------------------------------------------x

### THE GOVERNMENT'S MEMORANDUM OF LAW
### IN OPPOSITION TO THE DEFENDANT'S PRE-TRIAL MOTIONS

The Government respectfully submits this memorandum of law in opposition to the pre-trial motions of defendant Joseph A. Tricario (the "defendant").  Those motions include: (i) a request for a bill of particulars; (ii) a motion to dismiss on venue grounds; and (iii) a request for a hearing to determine the audibility of recorded conversations.  This Memorandum of Law responds to each of the above-referenced motions[1].

For the reasons set forth below, the Government respectfully submits that each of these motions should be denied in its entirety.  In particular, as to the a request for a hearing to determine the audibility of recorded conversations, these conversations were intercepted in the course of a lengthy investigation, during which the Government intercepted thousands of conversations over monitored cellphones, body wires and listening devices in order to gain evidence against the crew of Genovese Family capo and acting boss Danny Leo, the Genovese

---

[1]     In this memorandum, the Government will refer to the defendant's motion as "Tricario Br.".  The Government has also filed today the Affirmation of Assistant United States Attorney Eric Snyder, with various exhibits containing Title III applications and other materials relevant to the Government's response to this motion.  When the Government refers to the agent's affidavit accompanying a Title III application, the Government will note it as "Snyder Aff., Ex. ___ (Agent Aff.), ¶ ___".

Family administration, and other members and associates of the Genovese Family. The Government will identify all of the conversations that we believe either: (1) involve defendant Joseph Tricario as a participant; or (2) discuss the crimes with which Tricario is charged. The Government believes that this will amount to no more than 50 recordings and the Government will identify these for Tricario within the next two weeks. The Government will also select from these recordings no more than 25 conversations that we will potentially offer at trial. Finally, the Government will then provide to the Defendant, at least one month prior to trial, transcripts for those conversations that the Government plans to offer at trial. Accordingly, an audibility hearing would be premature at this time.

## BACKGROUND

On July 30, 2007, Indictment S31 06 Cr. 08 (LAK) ("the Indictment"), which was returned by a Grand Jury sitting in the Southern District of New York, was unsealed. The Indictment charges Tricario with conspiring with two members of the Genovese Organized Crime Family (the "Genovese Family") and one other associate of the Genovese Family to: (1) make extortionate extensions of credit; (2) use extortionate means to collect extensions of credit; and (3) commit extortion.

### A.    The Investigation

The charges in this Indictment stem from an eighteen month investigation into the criminal activities of various members and associates of the Genovese Family based in New York and Bronx Counties, New York, as well as New Jersey. The investigation focused on the operations of a crew controlled by Danny Leo, a long-time Capo in the Genovese Family, and the acting boss of the Family at the time of his arrest.

As charged in the Indictment, Tricario participated in the conduct of the Genovese

Family's affairs by conspiring with Danny Leo and Joseph Leo to: (1) make loansharking loans to an owner of a taxi business, ("Victim-1"); and (2) extort that same victim, Victim-1. At times, at least one other made member of the Genovese Family, Genovese Soldier Charles Salzano, a/k/a "Fat Charlie," participated in the charged conspiracies that were committed by Tricario.

As described in the Criminal Complaint, 07 Mag 860, which was originally filed against Tricario on May 29, 2007, Victim-1 borrowed a total of approximately $150,000 from Salzano in approximately 2002, 2003 and 2004. Victim-1 and Salzano agreed that Victim-1 would pay three "points," or three percent of the amount borrowed per week, as interest on these loans. Victim-1 made payments to Salzano on a regular basis for several years before falling behind in or about July 2006. Thereafter, Salzano and Tricario began to first pressure, then make threats that Victim-1 would suffer physical injury if he did not pay the money he owed on this illegal debt. Victim-1 believed that Tricario was the "heavy hand" or "muscle" for Salzano. During the time that Victim-1 was able to make payments to Salzano, he paid in excess of $200,000 on the original loan principal of $150,000. (Snyder Aff., Ex. 1 (Criminal Complaint), ¶ 2-5).

Two of the meetings that Victim-1 had with Salzano and Tricario were recorded. During the first of these, one that occurred on Saturday, October 7, 2006, Victim-1 met with Salzano and Tricario, in a meeting that was ordered by Salzano to discuss this loanshark debt. During the beginning of this meeting, Tricario escorted Victim-1 to where Salzano was waiting and asked Victim-1, "Do you have anything?" When Victim-1 explained that he did not have the $50,000 that Salzano expected and only had $1,000 for Salzano, Tricario responded, "I'll tell you right now, he (Salzano) is gonna fucking snap."

Then, after Salzano was informed that Victim-1 had only $1,000 to pay toward this loansharking debt, Salzano stated, "Now this is a fucking insult. I thought at least 50 ($50,000, a

3

portion of the illegal debt that was still owed by the Victim)."  Later in that same meeting as

Tricario stood next to Victim-1, Salzano asked Victim-1, "When you gonna pay me, next

month?  Next week?  I'll stop everything you are doing with J.P. (a business associate of the

Victim).  I'll stop it today.  You understand?  I'll stop every fucking thing and I'll make it that

any day I reach you, and, I gotta turn you out.  Is that what you want?"  Still later in that same

conversation, Salzano stated to the Victim, "You're with me.  I don't give a fuck who you talk

to, you belong to me until you pay it.  Then once you pay me, it's up to me to release you.  Don't

think you are talking to other people and say, 'don't worry about nothing,' because I'll show you

the fucking day."  During that exchange, Tricario stated to Victim-1, "I asked you the other day

on the phone, 'What are you gonna have?'"  Victim-1 responded to Tricario, explaining that he

didn't know how much money he was going to be able to pay, further explaining to Tricario that

he, Victim-1, was going to sell his building and his business.  (Snyder Aff., Ex. 1 (Criminal

Complaint), ¶ 5)

    During the second meeting that was recorded, one that occurred at approximately 8:00

a.m. on Saturday, October 28, 2006, Victim-1 again met with Salzano and Tricario, in a meeting

that was ordered by Salzano to further discuss this debt.  During this meeting, Salzano and

Tricario continued to pressure Victim-1 to pay his illegal loansharking debt, and Salzano, while

Tricario was present, threatened Victim-1 stating, "They don't want me to get violent with you,

but they'll send someone to get violent with you."  At the conclusion of this meeting, Tricario

confirmed the date of the next meeting between Victim-1, Salzano and himself to further discuss

payment of this illegal debt. (Snyder Aff., Ex. 1 (Criminal Complaint), ¶ 6)

    Immediately following this meeting, Salzano traveled to the Bronx to report what had

happened to the Genovese Family heirarchy.  During this meeting, which occurred on October

4

28, 2006, at 9:52 a.m., Salzano and Joey Leo sat in Joey Leo's car and discussed the

loansharking loan to Victim-1 and the subsequent extortion of payments from Victim-1. This

conversation was intercepted, pursuant to Title-III authorization, over a listening device that was

in Joey Leo's car. This conversation was described in detail in one of the Government's early

Title III affidavits **(November 8, 2006).** (Snyder Aff., Ex. 2 (Agent T-III Aff.), ¶13 (c)).

Additionally, a GPS device that was located in Joey Leo's car indicated that the car was located

in front of 3088 Coddington Avenue, Bronx, New York when this conversation took place.

      During this conversation, Salzano and Joey Leo specifically discussed Victim-1's failure

to pay Salzano the money that Salzano expected to collect for Danny Leo[2]. Salzano explained to

Joey Leo what had happened during his meeting with Victim-1 earlier that morning. Salzano

---

[2] Danny and Joey Leo's involvement in this loansharking loan to Victim-1 and the subsequent extortion of payments from Victim-1 was established through several intercepted conversations which were described in one of the Government's early Title III affidavits **(March 28, 2006).** (Snyder Aff., Ex. 3 (Agent T-III Aff.), ¶14 (g) and (h)). For example, on March 18, 2003, Danny Leo and Joey Leo were intercepted engaging in a discussion about Victim-1's business being shut down and his operation of the taxi business from his home. (Snyder Aff., Ex.3 (Agent T-III Aff.), ¶ 14 (g)). In another intercepted conversation, one from March 19, 2006, Danny Leo and Joey Leo discussed Victim-1's request for a couple of more weeks to come up with the money to be paid to Salzano for Danny and Joey. In that discussion, Joey reported that Salzano was afraid to pressure Victim-1 because of Salzano's concern that law enforcement was following him to which Danny responded, "It's all bullshit, Joe. The story. I want to know what's going on. If he [Salzano] is gonna see me Tuesday, he's gonna see me Tuesday." Joey Leo continued to explain how Victim-1 intended to sell the building which formerly housed his business, stating, "He [Salzano] told me the place is closed and he is gonna sell the property [Victim-1 is going to sell the property that once housed his business]. He [Victim-1] asked for a couple of more weeks [before making the debt payment on the illegal loansharking loan], no more loans, no more nothing, just sell." Danny Leo asked, "Who is he going to sell it to, Joe? That is why I have to see him [Salzano]. I want to know who he is going to sell it to, and how long it is going to take to sell. That's fuckin bullshit." A bit later in the conversation, Danny Leo stated, "Make that appointment for Tuesday. What does he [Salzano] think, [that] he is going to make these guys rob my fuckin money? What's the matter with this fuckin asshole [Salzano]? " (Snyder Aff., Ex. 3 (Agent T-III Aff.), ¶ 14 (h)).

stated, "I said, 'what you gonna [give] me, 20 [$20,000] on Thursday?' He, [Victim-1[3]] said, 'please, have patience.' He [Victim-1] says, 'you've waited so long.' He said, 'it's not me, the guy leased the building. It's the fucking city, they fucking, fuck ui. Now it's the concrete, now it's the stucko around the building [Salzano was informing Joey Leo of the reasons that Victim-1 gave to Salzano as to why he, Victim-1, was having trouble selling the building in which is business was located].' He's now looking to move every which way I ask. He's showing I'm gonna get ui." Salzano then asked Joey if Danny would allow him to travel to Florida on a planned vacation even though Salzano had failed to collect this money from Victim-1. Salzano asked, , "Could I still go? Florida?" Joey stated, "I'll ask tomorrow [ask Danny Leo]." Salzano stated, "I'm asking you, if he [Danny Leo] don't want me to go. . ." Joey stated, "Let me go ask Danny [Danny Leo]." (Snyder Aff., Ex. 2 (Agent T-III Aff.), ¶13 (c)).

Later in that conversation, Salzano apologized for his failure, stating, "I'm sorry Joe, that I took you out with this." Joey stated, "No, you're minutes away [referring to Salzano and the fact that he drove from Long Island, where he met with Victim-1, all the way to the Bronx where Joey was staying with his mother]." Salzano stated, "I know, I know..I'm assuming the other day. You know, I'm sorry I am ruining your fucking life too [likely referring to how Danny Leo will be unhappy with Joey and Salzano for failing to collect the money from Victim-1 and the possibility that their handling of Victim-1 may have brought law enforcement scrutiny on Danny Leo and his crew]." Joey stated, "How are [you] ruining..Charlie. This is life. You ain't gotta tell me nothing, how long did you tell him [how long did Salzano tell Victim-1 it would be before they would commit an act of violence against Victim-1]?" Salzano stated, "I know it, but

---

[3] Victim-1 was referred to as CS-7 in this Title III affidavit.

they...direct Petesie (ph) do it.  He wants in.  So, he's scared...but he came like ui...ahhh is this happen Joe.  well that's when you telled, I said Paul [Victim-1], you ruined my fucking life with this.  Id.

Still later in that same conversation, Salzano apparently warns Joey Leo that Victim-1 may be cooperating with law enforcement stating, "Yeah...they went, they mic'd.  they started telling me things..that Paul [Victim-1] is pinched.  I go out and beat him.  Joey, I'm fucking dead."  Salzano then continued by explaining that he believed that the Federal Bureau of Investigation was targeting Danny Leo for this loansharking and extortion activity stating,"[t]hey [law enforcement] don't even want to accept the martyr [Salzano appears to be referring to himself as the person that will get arrested for this but indicating that the FBI will want more than him, and will also try to prosecute Danny Leo for this extortion of Victim-1], this development fucking we want somebody high up on involving someone...and ahhh."  A bit later in the conversation, Salzano continued, "And then they [likely referring to the FBI] mentioned Danny."  Joey then apparently instructed Salzano that he should never inform anyone that Danny Leo was involved.  Still later in that same conversation, Salzano stated, "Joey, he comes up with 150 [possibly referring to $150,000, the approximate amount that Victim-1 had indicated he might receive from the sale of a portion of his business]."  Joey  stated, "oh yeah?"  Salzano stated, "and then I'm gonna go tell him I'll squeeze him for it [a large part of that $150,000 that Victim-1 owes to Danny Leo and Salzano for the loansharking debt."  Id.

In addition to the meeting in the Bronx on October 28, 2006, the Federal Bureau of Investigation then reviewed telephone records for Salzano's cellphone and determined that on May 2, 2006, Salzano, while in the Southern District of New York, placed telephone calls to both Tricario and Victim-1.  ((Snyder Aff., Ex. 1 (Criminal Complaint), ¶ 7).

B.    **The Indictment and Discovery**

On July 30, 2007, the Grand Jury returned a four count, superseding Indictment, S31 06

Cr. 08 (LAK) charging Danny Leo, Joey Leo and Tricario with: (1) conspiracy to make

extortionate extensions of credit (Count One); (2) conspiracy to use extortionate means to collect

a loanshark debt (Count Two); (3) conspiracy to commit extortion (Count Three); and, (4)

conspiracy to commit extortion of other victims (Count Four) as to Danny Leo only.

Following the Indictment, the Government produced to Tricario discovery pursuant to

Rule 16 of the Federal Rules of Criminal Procedure.  Among other things, the Government

produced all of the Title III applications, affidavits, reports, and orders; 21 CDs of the Title III

interceptions; linesheets of those conversations; a CD containing the consensual recording of the

October 7, 2006 conversation involving Tricario, Victim-1 and Salzano; a CD containing the

consensual recording of the October 28, 2006 conversation involving Tricario, Victim-1 and

Salzano; transcripts of those two conversations; a CD containing video surveillance of the

October 7, 2006 meeting involving Tricario, Victim-1 and Salzano; and photographs of the

October 7, 2006 meeting involving Tricario, Victim-1 and Salzano.

**POINT I**

**THE DEFENDANT'S REQUEST FOR A BILL OF PARTICULARS
SHOULD BE DENIED**

Tricario seeks an order from the Court directing the Government to provide him with a

bill of particulars regarding what can only be described as a laundry-list of items, including: (1) a

list of overt acts alleged against Tricario in furtherance of the conspiracy; (2) identification of

any overt acts alleged to have occurred in the Southern District of New York; (3) the identity of

the victims of the conspiracies; (4) the identity of all alleged coconspirators of Tricario; (5) the

8

dates upon which Tricario, and all coconspirators are alleged to have joined the conspiracy; (6) the specific locations where credit was extended or sought to be collected; (7) the dates and amounts of any payments to or from any person in connection with the conspiracy and any parties involved; (8) the dates upon which all conspiratorial meetings are alleged to have occurred; (9) any acts of intimidation or threats that Tricario agreed or attempted to perform in connection with Victim-1 in the Southern District of New York; and (10) list of any audio or video recordings in which Tricario's participation in, or knowledge of, the crimes charged is referenced in any way.

The defendant however, presently possesses more than sufficient information to understand the charges against him, to prepare a defense, to avoid unfair surprise at trial, and to protect himself against double jeopardy. As he is entitled to no more, his requests for a bill of particulars should be denied.

## A.    Applicable Law

The proper scope and function of a bill of particulars is to furnish facts supplemental to those contained in the indictment that are <u>necessary</u> to apprise the defendant of the charges against him with sufficient precision so as to enable him to prepare his defense, to avoid unfair surprise at trial, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); <u>United States</u> v. <u>Torres</u>, 901 F.2d 205, 234 (2d Cir. 1990); <u>United States</u> v. <u>Bortnovsky</u>, 820 F.2d 572, 574 (2d Cir. 1987); <u>United States</u> v. <u>Panza</u>, 750 F.2d 1141, 1148 (2d Cir. 1984). "Those are the only legitimate purposes of a bill of particulars." <u>United States</u> v. <u>Sindone</u>, 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise defendant of the specific acts of which he is accused." <u>Torres</u>, 901 F.2d at 234. <u>See United States</u> v. <u>Earls</u>, 2004 WL 350725,

9

at *4 (S.D.N.Y. Feb. 25, 2004). Accordingly, the ultimate test is whether the information sought is necessary, not whether it is helpful. See Earls, 2004 WL 350725, at *4; United States v. Lauerson, 1999 WL 440619, at *3 (S.D.N.Y. June 28, 1999).

If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as discovery, no bill of particulars is required. Bortnovsky, 820 F.2d at 572; United States v. Spy Factory, 960 F. Supp. 684, 690-91 (S.D.N.Y. 1997). The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not to be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches. See United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994). "[A] bill of particulars is not a general investigative tool, a discovery device, or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." United States v. Nunez, 2001 WL 91708, at *5 (S.D.N.Y. Feb. 1, 2001); accord Earls, 2004 WL 350725, at *5. A bill of particulars should not be used to learn evidentiary detail, see Torres, 901 F.2d at 234, the precise manner in which the charged crimes were committed, see United States v. Andrews, 381 F.2d 377, 377-78 (2d Cir. 1967), the manner in which the Government will prove the charges, see United States v. Leonelli, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), all the overt acts in furtherance of a conspiracy, see United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975), or particular acts that a particular defendant participated in, had knowledge of, or for which he is being held responsible, see United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993). For example, "the government is not required to prove how or when the conspiracy was formed or how or when defendants joined the conspiracy." United States v. Pacheco, 902 F. Supp. 469, 474 (S.D.N.Y. 1995).

10

There are several reasons for this restricted use of a bill of particulars.  First, the Government is not required to provide information tantamount to an itemized preview of its proof because of the very real danger in criminal cases that the defendants will tailor their testimony to explain away the Government's pre-disclosed case.  See United States v. Cimino, 31 F.R.D. 277, 279 (S.D.N.Y. 1962).  Second, detailed inquiries into the Government's case would unduly restrict the Government in presenting its proof at trial.  See, e.g., Jimenez, 824 F. Supp. at 363; United States v. Goldman, 439 F. Supp. 352 (S.D.N.Y. 1977).  Courts in this District have consistently held that, because a bill of particulars "confines the Government's proof to particulars furnished, requests for a bill of particulars should not be granted where the consequence would be to restrict unduly the Government's ability to present its case."  United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987).  In sum, demands for "whens" and "wheres" and "with whoms" relating to the formation of and participation in schemes and conspiracies routinely have been denied.  Torres, 901 F.2d at 233-34; United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981) (motion for bill of particulars requesting identities of unnamed coconspirators, dates and locations of conspiratorial acts, and other detailed information properly denied); United States v. Wilson, 565 F. Supp. 1416, 1438-39 (S.D.N.Y. 1983).  If a defendant has been given adequate notice of the charges against him in the indictment or in some alternative form, the Government need not disclose additional details about the case.  See Bortnovsky, 820 F.2d at 574; United States v. Payden, 613 F. Supp. 800, 816 (S.D.N.Y. 1985).

In addition, particularly in a case of this nature, where the defendant is charged with engaging in extortion involving the use of fear and the threat of violence and the involvement of an organized crime family, the Government should not be required to provide information that

11

would, in effect, provide the defendant before trial with a preview of the Government's case and its witnesses, with all of the attendant risks to such disclosure.  "Discovery in criminal proceedings is not comparable to discovery in civil [proceedings] because of the nature of the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury."  United States v. Malinsky, 19 F.R.D. 426, 428 (S.D.N.Y. 1956).  As a court in this District has observed,

> The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present.  Accordingly, the Government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented.

Sindone, 2002 WL 48604, at *1 (citing United States v. Simon, 30 F.R.D. 53, 55 (S.D.N.Y. 1962); Cimino, 31 F.R.D. 277, 279 (S.D.N.Y. 1962)).

**B.    Discussion**

In light of the clear legal principles that limit the defendant's right to investigate the Government's proof and legal theories before trial, the defendant's requests for a bill of particulars should be denied.  The extensive discovery materials — including a very detailed Criminal Complaint which sets out the specifics of the loanshark loan as well the attempts to collect the money from Victim-1, two consensually monitored conversations in which Tricario and Salzano discuss the debt with Victim-1, video recorded surveillance and photographs of one of those meetings, and Title III intercepts which discuss the details of the extortion, — all provide the defendant with detailed information relating to the conduct with which he is charged. In addition to the substantial discovery that was provided by the Government, the Government sought pre-trial detention for each of the three defendants who were charged in this indictment as

12

well as Charles Salzano who was charged in an earlier superseding indictment; during those bail

arguments and in one letter submitted in support of the bail argument for Danny Leo, the

Government provided very detailed descriptions of the offense conduct charged in the

Indictment.

### 1.    The Defendant Requests a List of Overt Acts

The Defendant requests that the Court direct the Government to provide "a list of overt

acts alleged against Tricario in furtherance of the conspiracy."  (Tricario Br., at 3).  These overt

acts – which occurred during two threatening and violent encounters with Victim-1 – have been

described in great detail in the Criminal Complaint.  In the Criminal Complaint, the Government

provided extensive detailed information about the October 7, 2006 and the October 28, 2006

meetings which, together with the conversations that were intercepted pursuant to the Title III

authorization, form the basis of each of the three conspiracies against Tricario.  For instance, in

that Complaint, the Government described specific terms and amounts of the loansharking loans

made to Victim-1.  (Snyder Aff., Ex. 1 (Complaint) at 2).  Next, the Government described, in

detail, each of the two critical meetings that Tricario had with Salzano and Victim-1. Id. at 3-4.

Finally, the Government described how telephone records and Salzano's plea allocution

demonstrate that overt acts were committed in the Southern District of New York. Id. at 4.

### 2.    Request for Identities of Victim and Coconspirators

The defendant further seeks the identities of the other coconspirators or the victim to

understand the charges against him.  United States v. Conesa, 899 F. Supp. 172, 176 (S.D.N.Y.

1995).  Such requests for the identity of unnamed coconspirators and victims amount to

"requests for a list of the witnesses whom the Government intends to call at trial," and "they are

not entitled to this list before trial without a specific showing of need, which has not been

established in this case." United States v. Kevin, 1999 WL 194749, at *12 (S.D.N.Y. Apr. 7, 1999).

Not only has the defendant failed to make a specific showing of need, the Government has well-founded countervailing concerns regarding the safety of the unnamed individual victim. As the Title III affidavits describe, and as the Government has argued, each of the coconspirators were members and associates of the Genovese Organized Crime Family, who, among other things, have used fear and threats of violence to accomplish their criminal activities. In such a context, the Court should not require the premature disclosure of the Government's potential witnesses — which would, in effect, be the result if the Government were required to disclose all unindicted coconspirators and victims. See United States v. Nachamie, 91 F. Supp.2d 565, 572 (S.D.N.Y. 2000) ("the potential danger to coconspirators and the nature of the alleged criminal conduct" are among the factors a court should consider in deciding whether to order the identification of unindicted coconspirators); see also United States v. Turkish, 458 F. Supp. 874, 881 (S.D.N.Y. 1978) (balancing test in deciding to release Government witness list includes consideration of the "government's fear of danger from disclosure"); United States v. Cutolo, 861 F. Supp. 1142, 1148 (E.D.N.Y. 1994) ("The indictment lists murders of potential witnesses as a means by which the Colombo Family has attempted to conceal its activities. The court will not order the government to provide a witness list.").

### 3.    Other Requests

Finally, to the extent that the Defendant seeks additional information that can only be described as the specific details of the Government's proof at trial, including the names of all of the witnesses and unindicted coconspirators and the specifics of each overt act which the Government will prove at trial, the Indictment, the Criminal Complaint, and the discovery, as set

forth above, provide ample notice of the specifics of the charges, without any additional
information from the Government.  The defendant's attempt to learn evidentiary detail and the
identities of the Government's witness(es) should be rejected, for the reasons set forth above.
See Torres, 901 F.2d at 234; Andrews, 381 F.2d at 377-78.

Accordingly, bearing in mind that the test for a bill of particulars is not whether the
information sought is helpful to the defense, but whether it is necessary, the defendant's motion
for a bill of particulars should be denied.  A review of the defendant's demands make clear that
in large part he seeks a road map to the prosecution's case.  A review of the governing decisions
makes clear that he is not entitled to it.  The Government will follow its usual practice by
submitting to the Court any in limine motions relating to 404(b) evidence (if any), the
admissibility of coconspirator statements, and other evidentiary issues.  Thus, as detailed below,
well in advance of trial the defense will be receiving additional ample information about the
Government's proof, including many of the particulars that they seek now.  In a case such as this
— involving organized crime and a conspiracy to violently extort a victim — the defendant is
entitled to no more in the way of a preview of the case.

In his demand for a bill of particulars, the Defendant also seeks many of the precise types
of details that the caselaw discussed above specifically forecloses to him.  Indeed, analysis of the
very cases cited by the Defendant himself makes this abundantly clear.  In large part, defendant's
complaints are that he has not been advised of what particular acts he committed or in what
manner he participated in the conspiracies alleged.  But as set forth above, it is resoundingly
clear that the defendant is "not entitled to know . . . the means by which it is claimed [he]
performed acts in furtherance of the conspiracy, nor the evidence which the government intends
to adduce to prove [his] criminal acts."  Johnson, 21 F. Supp.2d at 339 (quoting United States v.

15

Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985)).

For example, the Defendant ask the Government to identify unindicted coconspirators in the offenses with which he has been charged. The Government has already identified three of those coconspirators – Danny Leo, Joseph Leo, and Charlie Salzano. For purposes of defending against the conspiracy charge, the defendant has no right at this stage to learn the identity of every coconspirator. The defendants do not provide any reasonable and specific explanation as to why immediate disclosure is required. Indeed, in the Criminal Complaint and the Indictment the Defendant has been given "the names of the key members of the charged conspiracies as well as a detailed description of how the conspiracy and and its members operated, details that have been held to obviate the need for a bill of particulars. United States v. Conesa, 899 F. Supp. 172, 176 (S.D.N.Y. 1995). With that information, the defendant cannot credibly claim that he must know the identities of any other coconspirators in order to understand the charges against him. Further, "to the extent that the defendant's requests for the identities of unnamed co-conspirators and victim are really requests for a list of the witnesses whom the Government intends to call at trial," — in other words, a veiled attempt to discern who is cooperating with the Government — "they are not entitled to this list before trial without a specific showing of need, which has not been established in this case." United States v. Kevin, No. 97 Cr. 763 (JGK), 1999 WL 194749, at *12 (S.D.N.Y. Apr. 7, 1999). To the extent that there are any additional known coconspirators, the Government will identify these individuals two weeks prior to trial.

In sum, for all of the foregoing reasons, the Defendant's motion for a bill of particulars should be denied.


### POINT II

16

**TRICARIO'S MOTION TO DISMISS FOR
LACK OF VENUE SHOULD BE DENIED**

Defendant Tricario moves to dismiss the Indictment for lack of venue.  Tricario claims

that, "[t]he Government has not identified any evidence of any act that allegedly occurred in the

Southern District of New York, and has certainly not even specified any allegation of any

criminal act in the Southern District of New York that is remotely connected to Defendant

Tricario." (Tricario Br. at 5).  As a preliminary matter, this claim ignores the information that

was provided to the Defendant in the discovery materials and in the Criminal Complaint.  In the

Complaint, the Government specifically described how telephone records demonstrate that

Salzano made telephone calls from Manhattan which constitute overt acts committed in the

Southern District of New York. (Snyder Aff., Ex. 1 (Complaint) at 4).  In the discovery

materials, the Government turned over a detailed linesheet/transcript of the conversation that

Salzano and Joey Leo had in the Bronx at 9:52 a.m. on October 28, 2006.  This linesheet

specifies that the conversation occurred in the area of "Coddington, Bronx."  Additionally, the

November 8, 2006 Title III affidavit also provides a detailed summary of this conversation and

indicates that it took place in the Bronx.  (Snyder Aff., Ex. 2 (Agent T-III Aff.), ¶13 (c)).

A.    **Applicable Law**

The proper forum for a criminal prosecution is the district in which the crime was

committed. U.S. Const. Art. III, § 2 cl. 3; id. Amend. VI; Fed. R. Crim. P. 18.  However, venue

is not limited to the location where the physical acts necessary to commit a particular crime are

committed.  Where "the acts constituting the crime and the nature of the crime charged implicate

more than one location," the Constitution "does not command a single exclusive venue." United

States v. Reed, 773 F.2d 477, 480 (2d Cir. 1985).  A defendant charged with such a continuing

17

offense may be tried in any district in which some part of the offense occurred.  <u>See, e.g.</u>, <u>United States</u> v. <u>Naranjo</u>, 14 F.3d 145, 147 (2d Cir. 1994); <u>United States</u> v. <u>Delia</u>, 944 F.2d 1010, 1013-14 (2d Cir. 1991).  Section 3237(a) of Title 18 provides explicitly that any offense "committed in more than one district" may be "prosecuted in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).  Put another way, "[b]ecause the offense consisted of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." <u>United States</u> v. <u>Brennan</u>, 183 F.3d 139, 145 (2d Cir. 1999) (quotation omitted).

Determining whether venue in a given district is proper requires a two-step process. The first step is to determine whether the offense of conviction is a "continuing offense" under § 3237(a).  The second step is to "ask whether the criminal activities in question bear 'substantial contacts' to the Southern District of New York, in order to ensure that the policies and considerations underlying the Constitution's commands respecting venue have been preserved." <u>United States</u> v. <u>Saavedra</u>, 223 F.3d 85, 89 (2d Cir. 2000). These two steps are "related inquiries." <u>Id.</u>  Further, in a conspiracy prosecution, "'venue is proper in any district in which an overt act . . . was committed by any of the coconspirators.'"  <u>United States</u> v. <u>Smith</u>, 198 F.3d 377 (2d Cir. 1999) (quoting <u>Naranjo</u>, 14 F.3d at 147); <u>see also</u> <u>United States</u> v. <u>Geibel</u>, 369 F.3d 682, 696 (2d Cir. 2004).

## B.    Discussion

Tricario's argument that venue is improper in this District for the three charged conspiracy counts should be rejected as meritless or, at the very least, as premature. The law is clear that, at the pre-trial stage, the Government's burden on venue is dispositively met by the Indictment's averments.  <u>See, e.g.</u>, <u>United States</u> v. <u>Heredia</u>, 2003 WL 21524008 (S.D.N.Y. 2003)

18

("On its face, the indictment alleges that both offenses occurred 'in the Southern District of New York and elsewhere,' which is sufficient to resist a motion to dismiss."); United States v. Wilson, 2001 WL 798018, *8 (S.D.N.Y. July 13, 2001) (DLC) ("It is generally true that the allegation that the offense took place in this district is sufficient to survive a motion to dismiss for improper venue") (citing cases); United States v. Shvarts, 90 F. Supp.2d 219, 224 (E.D.N.Y. 2000) ("It would be an effectuation of research to cite the many cases which hold that venue is a fact to be proven by the government at trial by a preponderance of the evidence and that allegations of venue in the indictment must be taken as true."), abrogated on other grounds, In re United States (Coppa), 267 F.2d 132 (2d Cir. 2001). Because Counts One, Two and Three allege that the conspiracies involving Victim-1 occurred "in the Southern District of New York and elsewhere," Tricario's motion to dismiss Counts One, Two and Three for improper venue is meritless and should be rejected at this stage of the case.

Moreover, in this case, there is ample basis for venue in the Southern District of New York. The Government anticipates that the evidence at trial will demonstrate that substantial steps to accomplish the objectives of these conspiracies were undertaken in the Southern District of New York. Specifically, as described above, on October 28, 2006, Charlie Salzano met with Joey Leo in the Bronx to report to Joey Leo and Danny Leo his, Salzano's, failure to get a large amount of money from Victim-1. In that conversation, Salzano also relayed to Joey his concerns that Victim-1 may me cooperating with law enforcement and may have recorded the meeting. Joey Leo then instructed Salzano not to inform anyone of Danny Leo's involvement in these crimes. The GPS on Joey Leo's vehicle pinpointed the location of this conversation in the Bronx, New York.

In addition to this meeting, the Government will introduce evidence, in the form of

19

telephone records which demonstrate that, on May 6, 2006, Salzano called both Tricario and Victim-1 from an area in Upper Manhattan.

Based on this proffered evidence — which is not intended to be a complete summary of the Government's anticipated proof at trial — it is clear that the motion to dismiss should be denied. As to the conspiracies charged in Count One, Two and Three, the proffered evidence shows that there were overt acts in furtherance of the conspiracy which occurred in the Bronx and Upper Manhattan, both of which are in the Southern District of New York. Indeed, the evidence will also show that planning for the attempts to extort this money from Victim-1 took place in Joey Leo's car while he and Danny Leo were in the Bronx and Manhattan, and therefore, that the charged conspiracies have "substantial contacts" with this District.

## POINT III

### THE DEFENDANTS' REQUESTS FOR AN
### AUDIBILITY HEARING SHOULD BE DENIED

The Defendant also requests an audibility hearing arguing that a recorded conversation "may be inadmissible if the unintelligible portions of the recording are sufficiently substantial 'as to render the recording as a whole untrustworthy.'" (Tricario Br. at 5). For the foregoing reasons, the defendant's motion should be denied at this time as premature.

There are numerous recordings of conversations that were made pursuant to the various Title III applications in this case. There are also two consensual recordings made by Victim-1 after he began cooperating with the Government. Some of these conversations are over an hour in duration. The vast majority of these recordings are audible and intelligible, and where they are not completely audible, the transcripts provided to the jury will so indicate. To date, the defendant has not identified any sessions or conversations that he contends are inaudible. Instead,

Tricario states, that any inaudible portions "may . . .'render the recording as a whole untrustworthy.'" Id.

The Second Circuit has expressed its "clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility." United States v. Arango-Correa, 851 F.2d 54, 58 (2d Cir 1988) (citing United States v. Bryant, 480 F.2d 785, 790 (2d Cir. 1973)). Indeed, "[t]he mere fact that some portions of a tape recording are inaudible does not by itself require exclusion of the tape." Arango-Correa, 851 F.2d at 58; see also Bryant, 480 F.2d at 790 (approving admission of tapes even though it found "some parts of the tape were totally inaudible" and that "[o]ther parts were so garbled that only some jurors were able to understand what was being said"). As one court has explained, to exclude a recording simply because portions of it are inaudible or incomplete, without a positive showing of deception, "is no more valid" than to exclude the testimony of a witness because of his or her "failure to overhear all of a conversation." Monroe v. United States, 234 F.2d 49, 54-55 (D.C. Cir. 1956) (cited with approval in 1 Weinstein's Evidence ¶ 106[01], at 106-12 (1986)). Thus, a recording is admissible unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy. Id. (citing Bryant, 480 F.2d at 790 (internal citation omitted)).

In deciding whether a tape recording should be admitted, a court must "focus[] on the probative nature of the tapes, and not merely their audibility." Arrango-Correa, 851 F.2d at 58-59; see also Bryant, 480 F.2d at 790 ("Nor can we say that the inaudible parts are so substantial as to render the remainder more misleading than probative"); United States v. Botero, No. 93 Cr. 274 (JFK), 1993 WL 427027, at *2 (S.D.N.Y. Oct. 18, 1993) ("If the Court concludes that the probative value of N-4 outweighs its potential to mislead, the fact that portions of it are inaudible or unintelligible goes to weight, not . . . admissibility." (citation and internal quotation marks

21

omitted)).  Further, a court may admit small portions of a recording, where probative, even if significant portions of the same recording are inaudible or unintelligible. See United States v. Walker, No. 99 Cr. 379 (BSJ), 1999 WL 777885, at *3 (S.D.N.Y. Sept. 29, 1999) (admitting about 24 minutes of 3 hour conversation despite the defendant's argument that significant portions of the recording were inaudible and unintelligible).

Transcripts of recorded conversations, where accurate, are routinely admitted as an aid in listening to tape recordings. See, e.g., United States v. Chiarizio, 525 F.2d 289, 293 (2d Cir. 1975); Bryant, 480 F.2d at 790-91; Walker, 1999 WL 777885, at *3.  To the extent that the Government and the Defendant may end up disagreeing about the accuracy of a transcript, or the content of a tape, the proper procedure is not to exclude the transcript but to receive transcripts from both sides. Chiarizio, 525 F.2d at 293.  In the context of an audibility hearing, transcripts are particularly useful because the fact that recordings can be accurately transcribed is evidence that they are audible.

Objections to the audibility of a transcribed conversation or accuracy of a transcript must be specific. Gutierrez-Flores v. United States, No. 97 Civ. 5677 (CSH), 1999 WL 147735, at *9 (S.D.N.Y. Mar. 18, 1999).  A defendant cannot simply point to entire recordings and allege that they are inaudible.  Instead, the Defendant must point to specific portions of a recording, or of the transcript of the recording, and allege that the specific portion is so unintelligible as to render the recording untrustworthy.  Id.

As a preliminary matter, the Court should wait for the Defendant to specifically identify those portions of each of the recordings that he claims are inaudible and then require the Defendant to explain why it is that such inaudibility renders the recording, or a portion of the recording, untrustworthy.  Here, the defendant has not yet even identified any conversations or

22

sessions that are inaudible or incomplete.  Even after he has done so, the Defendant must then

explain why the audible portions, within a recording session, are rendered untrustworthy even if

the Court were to determine that some other section is inaudible.  In sum, the Defendant has not

yet articulated which conversations that he believes to be inaudible and why any audible portions

of those conversations are untrustworthy.  He should not expect that, simply by virtue of

identifying a recording session as one about which he has general audibility concerns, the Court

will then do his work for him and sift through hours of conversation, much of which cannot

seriously be the subject of an audibility hearing, and make audibility determinations.  This is

clearly insufficient to justify a hearing, and the Court should require the defendant to come

forward with more specific objections before holding a hearing.

       At any future audibility hearing — which the Government believes the Court does not

necessarily have to hold in the presence of the parties — the Court should review the challenged

portions of the recorded sessions both for probative value and for audibility.  Even if significant

portions of a particular conversation are inaudible, the Court should only exclude the

conversation or portion of the conversation if it is clear that the probative value of the audible

portions are outweighed by the potential of the recordings to mislead the jury.  See Arrango-

Correa, 851 F.2d at 58-59; Bryant, 480 F.2d at 790; Botero, 1993 WL 427027 at *2.  The

Government submits that, to the extent the defendant ultimately challenges any of the recordings,

none of the recorded sessions will be excluded.

       Since the Defendant has not yet identified any specific conversations which he believes

are inaudible, the Government submits that the Court should wait to receive all objections to

audibility at once.  The Government can then respond, and the Court can consider whether to hold

a hearing.  Finally, if the Court should grant the Defendant's request for an audibility hearing, the

23

Court should permit transcripts of the recorded conversations to be used in this case both at the audibility hearing and at the trial of this matter. The recordings of the conversations and sessions, while audible and intelligible, are sometimes difficult to follow due to their rapid pace and the occasional occurrence of simultaneous conversations. To the extent that the Defendant wishes to challenge the accuracy of the transcripts, which is an issue separate and apart from audibility, he can submit alternative versions of the transcripts. Permitting the use of transcripts will be helpful to the Court at the hearing and to the jury at trial and may avoid repeated replaying of the tapes.

## CONCLUSION

For the reasons set forth above, the defendant's pre-trial motions should be denied.


Dated: New York, New York
        December 31, 2007

                        Respectfully Submitted,
                        MICHAEL J. GARCIA
                        United States Attorney
                        Southern District of New York


                    By:__/s/_____
                        Eric Snyder/Benjamin Gruenstein
                        Assistant United States Attorneys
                        (212) 637-2534/2315

24

<u>AFFIRMATION OF SERVICE</u>

ERIC SNYDER affirms under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

That on December 31, 2007, I caused to be served by ECF and e-mail one copy of the within Government Memorandum Of Law In Opposition To Defendant's Pre-Trial Motions and my supporting Affirmation (without exhibits) to Douglas Tween, Esq., counsel in <u>United States</u> v. <u>Tricario</u>, et al., S31 06 Cr. 008 (LAK).


_____/s/_____
ERIC SNYDER
Assistant United States Attorney