UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>            v.<br><br>DANNY LEO,<br>JOSEPH LEO and<br>JOSEPH A. TRICARIO,<br><br>                     Defendants. | S31 06 CR 08 (LAK)<br><br>**DEFENDANT JOSEPH A. TRICARIO'S SENTENCING MEMORANDUM** |

BAKER & McKENZIE LLP
Douglas M. Tween
John A. Basinger*
1114 Avenue of the Americas
New York, New York 10036-7703
Tel: (212) 626-4355
Fax: (212) 310-1655
*Admitted Pro Hac Vice

Attorneys For Defendant
Joseph A. Tricario

We respectfully submit this Sentencing Memorandum on behalf of the defendant Joseph Tricario to assist the Court in determining a fair and just sentence. Mr. Tricario will appear before your Honor on September 12, 2008 for sentencing in connection with his plea of guilty to Count Three of a three-count Indictment[1] charging him with conspiracy to commit extortion affecting commerce under 18 U.S.C. § 1951.

Mr. Tricario recognizes the seriousness of the crime he has committed. He knows that what he did was wrong, and he has accepted responsibility for his actions and the consequences that have followed. Mr. Tricario does not, in any way, attempt to justify his actions by the statements made in this Sentencing Memorandum. However, we ask that the Court to consider Mr. Tricario's relative culpability within the conspiracy and his conduct toward others (see letters of support accompanying this Sentencing Memorandum as Exhibits A-P) in determining an appropriate sentence.

## I.   BACKGROUND

### A.   PROCEDURAL HISTORY

Joseph Tricario was arrested on May 30, 2007 pursuant to a Sealed Complaint[2] dated May 29, 2007, charging Mr. Tricario with one count of conspiracy to collect credit by extortion under 18 U.S.C. § 894. On that date, the Honorable Frank Maas set a bail package of $5 million personal recognizance bond, co-signed by four financially responsible persons and secured by $1 million in cash or property; home incarceration with electronic monitoring; surrender of travel documents; pretrial supervision; and no direct or indirect contact with the victim. Mr. Tricario was released from post-arrest detention on June 19, 2008. The Court later granted motions by Mr. Tricario to modify

---

[1] The Indictment contains a fourth count only against another defendant.
[2] The Complaint has since been un-sealed and is referenced as the "Complaint."

1

the conditions of his bail, allowing him to leave home to work within the Southern and Eastern Districts of New York. Since then, Mr. Tricario has been gainfully employed to support his family and has complied with the conditions of his bail.

On July 30, 2007, the Government filed a superseding indictment charging Mr. Tricario with three counts of conspiracy under 18 U.S.C. § 892, 18 U.S.C. § 894, and 18 U.S.C. § 1951.

On April 4, 2008, Mr. Tricario pleaded guilty and allocuted to Count Three of the Indictment under a plea agreement with the Government dated March 18, 2008. The plea agreement provides for the dismissal of the remaining counts at the time of sentencing, identifies the applicable Sentencing Guidelines range for the offense, and specifically recognizes that there is no agreement between the Government and Mr. Tricario regarding the application of U.S.S.G. § 3B1.2(b) for a mitigating role reduction. Mr. Tricario's bail conditions were continued pending sentencing.

Counsel for Mr. Tricario received the draft Pre-Sentence Investigation Report ("PSR") prepared by the Probation Office on June 6 and timely served comments and objections on June 20. At the time of serving this Sentencing Memorandum we have not received the final PSR.

### B. PERSONAL BACKGROUND

Joseph Tricario was born on December 29, 1967 in Minneola, New York, one of four sons of a construction worker and a homemaker. Joseph and his twin brother Anthony were the youngest. Joseph's father died of a heart attack in 1986, when Joseph was 18, and Joseph began caring for his mother financially and otherwise. He went to work as a construction laborer immediately after graduating from high school, and his work allowed his twin brother to go to college and graduate from St. John's University.

Mr. Tricario married his wife Donna in 2000. Even after marriage, Mr. Tricario and his wife continued to live at his mother's home until 2005, when he and his wife purchased their home. Mr. Tricario and his wife now have two sons, ages 7 and 3. Throughout his adult life, Mr. Tricario has worked in construction to support his family, and continues to do so. As reflected in the letters accompanying this Sentencing Memorandum, he is very dedicated to his family and friends and has a strong support network. Since the terms of his release in this matter were modified to allow him to work, he has taken every opportunity to do so, including working double shifts where available to provide for his family.

### C.   THE INSTANT OFFENSE

Mr. Tricario and Charles Salzano ("Salzano") have been social acquaintances for over ten years. In June or July of 2006, Mr. Tricario first accompanied Salzano to collect debts owed to Salzano by the Victim. *See* Complaint ¶ 3. Mr. Tricario met with the Victim on several occasions – not more than five or six – over the next several months to try to collect debts owed by the Victim to Salzano. On one or two of those occasions, the Victim provided $1,000 to Mr. Tricario, who turned all monies over to Mr. Salzano. Mr. Tricario was present when Salzano threatened the Victim on October 7, 2006 and October 28, 2006. Mr. Tricario never approached the Victim after the October 28, 2006 meeting.

## II.   MR. TRICARIO MERITS A 2 POINT REDUCTION UNDER U.S.S.G. § 3B1.2(b)

Mr. Tricario's plea agreement specifically preserves his ability to litigate the application of a role reduction under U.S.S.G. § 3B1.2(b). We respectfully submit that Mr. Tricario should receive a two-point deduction for minor role in the offense because:

3

(1) he had no part in the extensions of credit at issue; (2) he was involved in only a few meetings with the Victim covering only a short portion of the duration of the conspiracy; (3) he participated in collecting a small fraction of the funds paid by the Victim; (4) he was not aware of the full extent of the conspiracy; (5) he did not threaten the Victim; and (6) he received no money for his part in the conspiracy. All of these items, individually and taken together, indicate that Mr. Tricario is substantially less culpable than the other participants in this conspiracy and substantially less culpable than the typical participant in a loansharking conspiracy. *See United States v. Carpenter*, 252 F.3d 230, 234 (2d Cir. 2001).

### A.   THE CONSPIRACY

According to the Government, Salzano is a soldier, or made member, of the Genovese Organized Crime Family. Salzano acted as a primary lieutenant for Danny Leo, the acting boss of the Genovese family. 5/30/2007 Tr. at 6:19-7:2; PSR ¶ 66.

Beginning in 2002 and continuing in 2003 and 2004, Salzano made several loans to the Victim totaling approximately $150,000. Complaint at ¶ 2; Indictment at ¶ 1. Danny Leo provided the money for the loans and directed Salzano's activities. 5/30/2007 Tr. at 11:23-24; PSR ¶ 66. Also involved in the loan-sharking conspiracy was Joey Leo, who is Danny Leo's nephew and a Genovese family associate. PSR ¶ 67.[3] Following the

---

[3] Mr. Tricario objects to the characterization that he was an "associate" of the Genovese Organized Crime Family contained in PSR ¶ 68. Tricario was not in contact with anyone affiliated with organized crime other than Salzano, whom Tricario admittedly accompanied to collect money from the Victim. Likewise, Tricario's counsel has found no evidence in the Government's discovery that other individuals with ties to organized crime considered Tricario to be a "trusted individual" or otherwise "connected" with a crew as defined in PSR ¶ 48.

4

extensions of credit, the Victim made payments to Salzano for several years. *See* Complaint at ¶ 3.

Mr. Tricario had no involvement with making the loans. He had nothing to do with collecting the debts until mid-2006, when he first accompanied Salzano to meet the Victim and participate in attempting to collect debts. Complaint at ¶ 3. Mr. Tricario met with the Victim several times – no more than five or six – between approximately July and October 28, 2006. On one or two occasions, the Victim paid $1,000 of his debt to Mr. Tricario, who handed the funds over to Salzano. *See* Complaint ¶ 5.

### B. TRICARIO DID NOT PARTICIPATE IN THE EXTENSIONS OF CREDIT

Mr. Tricario did not participate in making the extensions of credit at issue. To the contrary, his involvement did not begin until mid-2006, long after the last extension of credit. *See* Complaint ¶ 3. Mr. Tricario had no knowledge of the extensions of credit or their terms at the time they were made. Notwithstanding the allegation to the contrary in Count I of the Indictment, we understand that the Government now concedes that Mr. Tricario was not involved in the extensions of credit.

### C. TRICARIO WAS INVOLVED FOR A SHORT PORTION OF THE DURATION OF THE CONSPIRACY

According to the Government, Salzano, and the Leos took part in the conspiracy beginning in 2002 through its conclusion in late 2006. They participated in the extension of credit and collections over a period of at least four years. Mr. Tricario, on the other hand, was involved for only approximately four months 2006.

### D. TRICARIO PARTICIPATED IN COLLECTING ONLY A SMALL FRACTION OF THE FUNDS

Salzano and the co-conspirators other than Tricario loaned the Victim approximately $150,000, and collected over $200,000 from the Victim during the course

5

of the conspiracy. Tricario was involved in collecting only $1,000 on one or two occasions. Mr. Tricario's participation in the conspiracy resulted in collecting somewhere between 0.5% and 1.3% of the funds collected.

### E. TRICARIO WAS NOT AWARE OF THE CONTOURS OF THE CONSPIRACY

Danny Leo provided the funds for the extensions of credit and directed Salzano in criminal activities. Government wiretaps demonstrate that Salzano, Danny Leo and Joey Leo communicated among themselves concerning collections of the debt from the Victim and that Mr. Tricario was not party to these conversations. Indeed, Mr. Tricario has never met or spoken with either of the Leos and was unaware of the contours of the conspiracy or the terms of the extensions of credit.

### F. TRICARIO DID NOT THREATEN THE VICTIM AND WAS NOT THE "MUSCLE"

Mr. Tricario did not threaten the Victim during any of their meetings. The threatening statements that the Government has identified in prior hearings and documents were made by Mr. Salzano, not by Mr. Tricario. Mr. Tricario's record – he has only one prior arrest, in 1990 (when he was 22 years old) – is inconsistent with the Goverment's contention that he was the "muscle" in criminal enterprises.

The Government has emphasized Mr. Tricario's statement on October 7, 2006, in response to the Victim's statement that he had only $1,000 for Salzano that day, that "I can tell you right now he [Salzano] is gonna fucking snap." But when Mr. Tricario

accompanied Salzano, Salzano was largely incapacitated by hemorrhoids.[4] The statement expressed that Salzano would be angry, not a threat of imminent physical harm.

Even Mr. Salzano's most threatening statement to the Victim, made on October 28 – "They don't want me to be violent with you, but they'll send someone to be violent with you" – clearly indicates that no threat is imminent at that meeting.[5]

The Government's characterization of Defendant Tricario as the "heavy hand" or "muscle" is also undercut by the fact that Victim-1 is very substantially larger, both in height and weight, than is Mr. Tricario.[6] The Government's video and audio surveillance shows that the Victim did not appear to be intimidated by Defendant Tricario. To the contrary, the Victim and Defendant Tricario shook hands as they met. *See* 10/7/06 Video at 08:26:24. They exchanged greetings at the same time. 10/7/06 Audio at 15:58-16:17. The Victim apparently reserved his concern for SALZANO himself, leaning against the door of the car in which SALZANO sat and largely ignoring Mr. Tricario. Mr. Tricario fidgeted and made occasional comments for about half of the 12-minute meeting, then went to the other side of the car and got back in as the Victim continued his discussion with Salzano. 10/7/06 Video at 08:33:54.

---

[4] SALZANO never got out of the car at this meeting, and his condition was referenced repeatedly in the Government's surveillance audio of the meeting, including the following (times listed are from the beginning of the recording):
20:47   SALZANO:   "The pain I'm in . . . you have no fucking clue."
23:40   SALZANO:   "I had hemorrhoids taken out."
28:55   SALZANO:   "They told me I'm going to be in pain for six to eight weeks. And when I tell you pain . . . my wife has to wipe my fucking ass."

[5] Tellingly, Government agents observing the October 7 and October 28, 2006 meetings felt no need to intervene to protect the Victim.

[6] Victim-1's size advantage over Defendant Tricario is visible in the moments that follow.

7

### G.     TRICARIO DID NOT PROFIT FROM THE CONSPIRACY

As indicated in a statement of the offense regarding his actions that was submitted in connection with the PSR, Mr. Tricario did not keep any of the money he collected, nor did he receive any other payment for his role in the conspiracy. Mr. Tricario was (and is) earning a legitimate living as a construction worker – his meetings with the Victim were on Saturdays – rather than profiting as criminal "muscle."

In short, Tricario functioned largely as a driver and minor collector of debt during a few months of the conspiracy. We respectfully submit that his limited involvement merits a minor role designation.

### III.     MR. TRICARIO'S CONDUCT TOWARD OTHERS AND FAMILY

In sentencing Mr. Tricario, we also respectfully request that the Court take into account the extent to which Mr. Tricario's crime is an aberration from his usual behavior. The letters of support provide an indication of the caring, dedicated person Mr. Tricario has been to his family and friends. A few samples are illustrative.

After his father died, Mr. Tricario's brother Salvatore writes that Mr. Tricario "took on the most" of all the brothers in caring for his mother:

> While many of his friends were out socializing, dating and enjoying their college years, Joseph passed up on a lot of activities to stay home and take care of our mother. He unselfishly gave up his limited free time (after working a full time job) to clean the house, shop for the home, take our mother to her medical appointments and kept up with the home repairs since financially we were limited and we could not afford outside help. Ex. A

Mr. Tricario's mother Elizabeth Tricario states that Mr. Tricario is:

> the one I depend on. He take me to doctors appointments, dentist, shopping and help me around the house, because I'm not in the best of health. Joseph helped my friends who are widows taking them to stores and shoveling snow

8

>for them in the bad weather and even driving them to & fro from work. Ex. B

Before he had children of his own, Mr. Tricario stepped in to help a friend with her child:

>When my daughter's father left (1991) because he didn't want children, I was quite devastated; I convinced myself no one would want a girl with someone else's child. Well Joey said to me, "that guy is an ass, who would leave their kid, forget about him!" By the time the child was 2 yrs. old, Joey would take time to go to the zoo, the beach, the park – any place you would take a kid. He would go out with his friends until the early hours of the morning and still get up to go with me and my daughter to do these things and NEVER complain. He made me realize that someone else WOULD want a girl with someone else's child! This allowed me to move on. Ex. C

David Heller, who worked with Mr. Tricario, describes him at work:

>I always knew Joey to be a hard worker. He was a leader of a crew of about 30 men and a few women. He treated everyone equally. He was fair with assigning duties to our work force. Joey also had a big heart. He would buy the homeless people who used to sleep in the park next to our work site breakfast and lunch, a bowl of soup, and a sandwich, milk and coffee – always on a rainy day. Ex. D

Perhaps most tellingly, his wife Donna describes Mr. Tricario with his family:

>As for our children, they mean the world to him. There was an incident two years ago, when our son Anthony was bit by a dog (due to a friend's negligence). Joe's only concern was for his son. As angry as he was, there were never any words spoken to the gentleman responsible. There was only complete concern for his son as he helped the doctors in the emergency room while they stitched his little head.
>
>Our son B\_\_\_\_ has needed a few surgeries since he was born. Joe was there every time B\_\_\_\_ came out of anesthesia screaming for his parents.[7]

---

[7] Per the Southern District's Privacy Policy, names of minor children have been redacted.

> My husband has always been a hard worker. He is in construction and when jobs end he will actively look for more work. He is one of the hardest working men I know. He accepts overnights as well as 7 days a week at times to make ends meet. In recent days my husband has taken on even more work to insure his families well being due to his uncertain future. Ex. E.

We respectfully request that the Court take into account Mr. Tricario's character as demonstrated through the way he has treated his family and friends, and the way he has worked, in setting a just sentence.

### IV.    MR. TRICARIO LACKS RESOURCES TO PAY A FINE

As detailed in his PSR, Mr. Tricario has no net assets. The money he earns from working goes to pay the basic bills for his family. Furthermore, since the original PSR was prepared, Mr. Tricario and his wife have prepared to sell their house in a short sale. Accordingly, we request that no financial penalty be imposed.

### V.    REQUEST FOR SELF-SURRENDER

Mr. Tricario has been under supervised release from post-arrest detention since June 19, 2007. In that time, he has complied with the terms of his release, and his supervising officer describes him as "highly cooperative." PSR ¶ 8. He has demonstrated that he will abide by terms set by this Court. He has used the time to work hard to try to avoid unnecessary hardship to his family. We request that Mr. Tricario be permitted to self-surrender to the facility designated by the Bureau of Prisons, and that he be permitted to continue the current terms of his bail until that time.

Dated:  New York, New York
       August 29, 2008

       */s John A. Basinger*
Douglas M. Tween
John A. Basinger*
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, New York 10036-7703
Tel: (212) 626-4355
Fax: (212) 310-1655
*Admitted *pro hac vice*

Attorneys for Defendant
Joseph A. Tricario

NYCDMS/1097336.2

11